KATHAN *v.* STEVENSON.

1. COVENANTS—RECORDING—BUILDING RESTRICTIONS—VOLUNTARY ASSOCIATION OF LOT OWNERS.

A voluntary association of owners of some of the lots in a subdivision has no power to add the desire of its members to the building restrictions of record, irrespective of whether person selling the lots consulted with the association or not.

2. SAME—RECIPROCAL NEGATIVE EASEMENTS—SUBDIVIDER'S VERBAL ASSURANCES.

Verbal assurances by subdivider to some lot buyers to exclude colored people from the use and occupancy of lot did not create a reciprocal negative easement as to such use since it did not impose such restriction upon the lot sold.

3. SAME—RESTRICTIONS—RECIPROCAL NEGATIVE EASEMENTS.

If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained may do nothing forbidden to the owner of the lot sold; they being subject to a reciprocal negative easement.

4. SAME—RECIPROCAL NEGATIVE EASEMENT—COVENANT RUNS WITH LAND.

A reciprocal negative easement created by the sale of a lot with restrictions beneficial to both the lot sold and those retained runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction.

5. DEEDS—INTENT.

The supposed intention of parties to a deed cannot overcome their express agreement.

6. COVENANTS—CONSTRUCTION OF RESTRICTIONS.

A restriction in a deed will not be enlarged or extended by construction even to accomplish what it may be thought the

parties may have desired had a situation, which later developed, been foreseen by them at the time the restriction was written.

7. SAME—CONSTRUCTION OF RESTRICTIONS.

The parties to a deed will be confined to the language employed in writing a restriction where the language used is clear.

8. SAME—RESTRICTIONS—COLORED PERSONS—COMMON PLAN OR AGREEMENT.

Subdivision in which lots were marketed as high-class, residential property and subject to building restrictions but recorded restrictions silent as to use and occupancy by colored persons may not be restricted against use by such persons where there was no plan or agreement common to all home owners in the subdivision relative to such use.

Appeal from Wayne; Richter (Theodore J.), J. Submitted October 13, 1943. (Docket No. 56, Calendar No. 42,480.) Decided December 29, 1943.

Bill by Dr. Albert D. Kathan and others against Harry B. Keidan and others to impress restrictions as to use and occupancy upon real estate. Bill amended so as to add Frederick T. Stevenson and wife. Dismissed as to defendants Keidan. Decree for defendants. Plaintiffs appeal. Affirmed.

*Frank C. Sibley (Arthur E. Fixel and N. C. Bigelow, of counsel), for plaintiffs.*

*Loomis, Jones, Piper & Colden, for defendants.*

*Bulkley, Dickinson, Wright & Davis, amicus curiae.*

WIEST, J. The bill herein was filed by resident property owners in Arden Park subdivision in the city of Detroit to restrain defendants, who are colored persons, from the use and occupancy of certain premises purchased by them in the subdivision.

Upon hearing, the bill was dismissed and plaintiffs review by appeal.

The subdivision was platted many years ago, with recorded building restrictions but without any restriction limiting use and occupancy to white persons. During the course of years only white persons purchased lots in the subdivision, erected expensive residences and it became a high-grade, residence district. In the bill of complaint is the following statement:

"Plaintiffs say that while there are no specific words in the recorded restrictions, excluding colored persons from the restricted neighborhood, still, the restriction being aimed at the maintenance of values and high residential character in the district, it must be necessarily implied that any act which intentionally destroys either or both the values and the high residential character are prohibited, for otherwise the acts of a few inconsiderate owners would destroy both by selling to colored persons and so defeat the intent and practical construction of the said restrictions. That defendants had notice and were bound by said plan of development, which necessarily excludes use and occupancy by colored people."

In 1928, Harry B. Keidan and his wife purchased the property involved in this suit and erected a house thereon in which they lived until the sale thereof by them to defendants in 1942. Their purchase and sale warranty deeds carried the recorded building restrictions. Mr. Keidan testified:

"I don't know whether there was an Arden Park Association or not. I was never asked to join any association. I heard there was an association but how long the association had existed I do not know.

"My house was the last constructed in Arden Park. So far as I know at the time I bought, only white people were living on that street."

The Arden Park Association was an informal voluntary joinder of some of the owners of homes in the subdivision interested in maintaining its high-grade character and assumed the right to pass upon the desirability of prospective purchasers of lots.

It is claimed that Max Broock, now deceased, who advertised and marketed most of the Arden Park lots, verbally agreed to submit to the association the names of prospective purchasers and assured some intending purchasers that colored persons would be excluded.

The records of the association were fragmentary and were not produced at the trial. The association had no power to add the desire of its members to the building restrictions of record and this is. true whether Max Broock, in making sales, consulted with the association or not. When the plat of the subdivision was ready for the sale of lots the intended high character thereof and its desirability for expensive residences was much advertised in the daily papers.

Plaintiffs contend there was a general plan of development for Arden Park and that plan excluded colored people. They base such contention on the general plan of development of Arden Park by display advertisements in the newspapers from February, 1912, through September, 1916. The advertisements are in the record. They made reference to rigid building restrictions making it the most "ideal, high-class, residence property in Detroit." The restrictions mentioned in the advertisements were building restrictions and made no reference to exclusion of colored persons. It is probably true that the purchasers of property in Arden Park, and who built expensive residences in accord with restrictions in their deeds, entertained

the idea that the character and expense thereof would bar colored persons. Verbal assurances by the subdivider to some lot buyers to exclude colored people from use and occupancy did not create a reciprocal negative easement.

The definition of a reciprocal negative easement set forth in *Sanborn* v. *McLean,* 233 Mich. 227 (60 A. L. R. 1212), bars application of the doctrine in the case at bar. We there said:

"If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction."

The verbal assurance by the seller to some purchasers of lots to exclude colored persons imposed no restriction on the lots so sold and, therefore, lacked the essential element of a reciprocal negative easement upon lots thereafter sold.

We find no evidence that defendants had legal notice of anything more than the building restrictions. The building restrictions which were of record and carried in the deed to Mr. Keidan and wife and, by them, to defendants cannot be enlarged or extended to include a restriction against use and occupancy of the premises by colored persons.

In *Moore* v. *Kimball,* 291 Mich. 455, we said:

"The supposed intention of the parties cannot overcome their express agreement, 18 C. J. p. 254; and a restriction will not be enlarged or extended by construction even to accomplish what it may be

thought the parties may have desired had a situation, which later developed, been foreseen by them at the time the restriction was written. *Davidson* v. *Sohier*, 220 Mass. 270 (107 N. E. 958). Where the language of the restriction is clear, the parties will be confined to the language which they employed.''

Evidently original purchasers of lots entertained the idea that the recorded building restrictions called for expenditures which would exceed the then financial means of colored persons. There was no plan or agreement common to all home owners in the subdivision relative to racial use and occupancy of premises. Defendants' grantors were never parties to any such plan and their property was not subjected to the desires of others on that subject.

The decree dismissing the bill is affirmed, with costs to defendants.

BOYLES, C. J., and CHANDLER, NORTH, STARR, BUTZEL, and SHARPE, JJ., concurred with WIEST, J. BUSHNELL, J., did not sit.