SIPES v. McGHEE.

1. COVENANTS—RESTRICTION AGAINST USE OR OCCUPANCY BY OTHERS THAN CAUCASIANS.

In suit to enforce restriction against use and occupancy of lots owned by defendants by others than Caucasians, plaintiff's testimony *held*, sufficient to sustain finding that defendants were not members of the Caucasian race but of the Negro race.

2. ACKNOWLEDGMENT—SEALS—NOTARIES IN OTHER STATES—CERTIFICATES.

Under the uniform acknowledgment act where foreign notary's seal is impressed upon a document acknowledged in another State it is not necessary that there be attached to the acknowledgment a certificate of the clerk of a court of record or the

secretary of State of such other State in order to be received in evidence in a court in this State (3 Comp. Laws 1929, § 13333).

3. COVENANTS—RESTRICTION AGAINST USE OR OCCUPANCY—EXECUTION.

Covenant against use or occupancy of certain lots by others than Caucasians, which was not to be effective until 80 per cent. of the property to be affected should be subjected to the restriction *held*, on *de novo* review to have been properly executed and acknowledged by owners of more than 80 per cent. of the property covered by the restriction.

4. ACKNOWLEDGMENT—CONVEYANCES—TECHNICAL OBJECTIONS.

Courts will uphold acknowledgments wherever possible and will not suffer conveyances or proof of them to be defeated by technical or unsubstantial objections.

5. COVENANTS—RESTRICTION AGAINST USE OR OCCUPANCY BY OTHERS THAN CAUCASIANS—CERTAINTY.

Restriction reading ''This property shall not be used or occupied by any person or persons except those of the Caucasian race,'' *held*, not void for uncertainty.

6. CONTRACTS—PUBLIC POLICY—APPLICATION OF PRINCIPLE.

The principle that contracts in contravention of public policy are not enforceable, should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.

7. SAME—DEFINITION OF TERM ''PUBLIC POLICY.''

''Public policy,'' as that term is used in determining the validity of contracts, may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like; it is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

8. WORDS AND PHRASES—PUBLIC POLICY—CONSTITUTIONAL LAW—STATUTES—COURTS.

Public policy is the cornerstone of all constitutions, statutes and judicial decisions and greater than any or all of them.

9. COVENANTS—PUBLIC POLICY—RACE DISCRIMINATION.

While public policy, as expressed in statutes and decisions of the Supreme Court prohibits racial discrimination in public educational institutions and places of public accommodation,

amusement and recreation, by life insurance companies doing business in the State, it is also the public policy to enforce certain restrictions upon the use and occupancy of real property (Comp. Laws 1929, §§ 6922, 7156, 7368, 12457; Act No. 328, §§ 146–148, Pub. Acts 1931).

10. SAME—RESTRICTIONS AS PROPERTY RIGHTS—EMINENT DOMAIN.

Restrictions on the use and occupancy of real property of a contractual nature are valuable property rights and cannot be taken under the power of eminent domain without compensation.

11. COURTS—RULES OF PROPERTY—PRECEDENTS.

A recognized rule of property ought not to be overturned without the very best of reasons.

12. COVENANTS—RESTRAINT UPON ALIENATION—RESTRICTION AGAINST USE OR OCCUPANCY BY OTHERS THAN CAUCASIANS.

While a restriction against the alienation of real property to non-Caucasian persons is void, a restrictive covenant against use or occupancy by others than Caucasians is not against public policy nor within the prohibition of the Fourteenth Amendment of the Constitution of the United States.

13. CONSTITUTIONAL LAW—DUE PROCESS.

The constitutional right of due process means that every person having property rights affected by litigation is entitled to notice, and a day in court, or a reasonable opportunity to appear and defend his interest (U. S. Const. am. 14, § 1).

14. SAME—EQUAL PROTECTION—COVENANTS—PRIVATE CONTRACTS.

The constitutional prohibition against denying the equal protection of the laws may not be applied to private relations and private contracts containing racial restrictive covenants that are not against public policy (U. S. Const. am. 14, § 1).

15. APPEAL AND ERROR—QUESTIONS REVIEWABLE—BRIEFS OF AMICI CURIAE.

In deciding a case the Supreme Court must confine its decision to matters within the record submitted to it and the questions raised in the briefs of the parties to the cause, not other matters raised in briefs *amici curiae*.

16. TREATIES—PRIVATE CONTRACTS—STATE COURTS.

A treaty between sovereign nations is not applicable to the contractual rights between citizens of the United States when a determination of these rights is sought in State courts.

17. WORDS AND PHRASES—JUSTICE.

Justice is the dictate of right, according to the common consent of mankind generally, or of that portion of mankind who may

be associated in one government, or who may be governed by the same principles and morals.

**18. SAME—LAW.**
Law is a system of rules, conformable to the prevailing standard of justice, and devised upon an enlarged view of the relations of persons and things, as they practically exist.

**19. COURTS—JUSTICE—LAW.**
The act of moulding justice into a system of rules detracts from its capacity of abstract adaptation in each particular case; and the rules of law, when applied to each case, are most usually but an approximation to justice.

**20. SAME—ABSTRACT JUSTICE—LAW.**
The determination of a case solely by the judge's own notions of abstract justice breaks down the barriers by which rules of justice are erected into a system, and thereby annihilates law, although a sense of justice should have an important influence in the adjudication of cases.

**21. SAME—PRECEDENTS—PUBLIC   RIGHTS—PRIVATE   CONTRACTS— STATE COURTS.**
The abolition of the differentiation between public rights and private or contractual rights, recognized by both statutes and countless judicial decisions, and the refusal of enforcement of private contractual rights will not be undertaken by a State court without prior legislative action or specific Federal mandate (U. S. Const. am. 14, § 1).

Appeal from Wayne; Miller (Guy A.), J. Submitted October 17, 1946. (Docket No. 90, Calendar No. 43,271.) Decided January 7, 1947. Rehearing denied March 3, 1947. Reversed by Supreme Court of the United States on May 3, 1948.

Bill by Benjamin J. Sipes, his wife, and others against Orsel McGhee and wife to restrain them from using or occupying house or permitting it to be occupied by persons other than those of Caucasian race. Decree for plaintiffs. Defendants appeal. Affirmed.

*Younglove & Chockley,* for plaintiffs.

*Francis M. Dent* and *Willis M. Graves,* for defendants.

*Amici curiae:*

National Association for the Advancement of Colored People, by *Thurgood Marshall, Robert L. Carter, Marian Wynn Perry* and *Edward M. Turner* (*Spottswood W. Robinson, III,* of counsel).

Detroit Chapter, National Lawyers Guild, by *Henry S. Sweeny,* President, and *Ernest Goodman.*

American Jewish Congress, Detroit Section, by *Benjamin J. Safir* (*Alan N. Brown,* of counsel).

National Bar Association, by *Earl B. Dickerson, Loring B. Moore, Richard E. Westbrooks* (*George N. Leighton,* of counsel).

International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW–CIO), by *Maurice Sugar* and *Morton A. Eden.*

Wolverine Bar Association, by *Ernest Richards* and *Hobart Taylor, Jr.*

Ardmore Association, Inc.,

Broadmoor Improvement Association,

Brookline No. 2 Association, Inc.,

Brookline Outer Drive Civic Association,

College Woods-Southfield Court Civic Association,

Embrook Civic Association,

Evergreen Village Civic Association of Detroit,

Grandmont Improvement Association,

Grandmont No. 1 Improvement Association, Inc.,

Grand River-Livernois Civic Association,

Joy Road Community Association,

Linwood-McGraw Civic Association, Inc.,

Lothrup Duffield Blvd. Park Association,

Mayfair Park Improvement Association,

Monnier Heights Improvement Association,

North Redford Association,

Northwest Redford Improvement Association,
Parkdale Civic Association,
Plymouth Tireman Improvement Association,
Puritan Greenfield Improvement Association,
Rosedale Park Improvement Association,
Seven Mile Evergreen Civic Association,
Southfield Woods Civic Association of Detroit,
Tel-Craft Civic Association of Detroit,
Tireman Joy Improvement Association,
Tireman Park Property Owner's Association,
　　Inc., by *Donald P. Schuur.*

BUSHNELL, J. Plaintiffs Benjamin J. Sipes, Anna
C. Sipes, and others own and occupy property
located in Seebaldt's subdivision and Brooks and
Kingon's subdivision on Seebaldt avenue, between
Firwood and Beechwood avenues, in the city of
Detroit.

Defendants Orsel McGhee and Minnie S. McGhee,
his wife, own and occupy property located on the
same street in Seebaldt's subdivision. All of the
properties occupied by the parties hereto are encumbered by the following recorded covenant:

"This property shall not be used or occupied by
any person or persons except those of the Caucasian
race."

Defendants seek reversal of a decree upholding
and enforcing this restriction. In order to obtain
that result, this Court is asked to overrule its holding in *Parmalee* v. *Morris,* 218 Mich. 625, (38 A. L. R.
p. 1180) where a restriction was upheld, which read:

"Said lot shall not be occupied by a colored person, nor for the purposes of doing a liquor business
thereon."

The questions involved in defendants' appeal concern the execution of recorded instruments relied

upon by plaintiffs, the proof of racial identity of the defendants, and the uncertainty of the language of the covenant and its validity.

Originally there were no racial restrictions affecting the property in question. Subsequently, certain property owners, in the block in which defendants' home is located, entered into mutual agreements imposing the above-quoted restriction. These various agreements were recorded in the office of the register of deeds of Wayne county on September 7, 1935. The agreements provide that the restriction in question should not be effective unless at least 80 per cent. of the property fronting on both sides of the street in the block is subjected "to this or a similar restriction." The deed running to defendants, which is dated November 30, 1944, and recorded on December 1, 1944, is "subject to existing restrictions as of record."

The testimony taken was not extensive and decision turns here, as it did in the circuit court, principally on legal questions. The main factual issue was with respect to the racial identity of the defendants. Sipes testified, over objections as to his qualifications as an expert, that defendants and their two sons are colored people. On cross-examination, he testified:

"I have seen Mr. McGhee, and he appears to have colored features. They are more darker than mine. I haven't got near enough to the man to recognize his eyes. I have seen Mrs. McGhee, and she appears to be the mulatto type."

Defendants did not take the witness stand, and the only testimony produced in their behalf was that of Dr. Norman D. Humphrey, an assistant professor of Sociology and Anthropology at Wayne University. He expressed the opinion that there is no simple way in which to determine whether a man is

a member of the Mongoloid, Caucasoid, or Negroid race. He explained that such classifications are very difficult and cannot be determined without scientific tests. Melvin Tumin, an instructor in the same department, stated that he agreed with the testimony of Dr. Humphrey.

The trial judge did not mention this subject in the written opinion which he filed, but the circuit court decree contains a finding—"that defendants, Orsel McGhee and Minnie S. McGhee, his wife, are not of the Caucasian race but are of the colored or Negro race." The testimony of Sipes is sufficient to sustain this finding. See *People* v. *Dean,* 14 Mich. 406, 423.

Appellants claim that the restrictive agreement was not properly executed by at least 80 per cent. of the property owners in the block. The signature of one of the property owners was acknowledged before a notary public in Indiana. There is no certificate of the clerk of a court of record or the secretary of State of Indiana attached showing that the notary public who executed the acknowledgment had authority to do so on the date mentioned.

Under the uniform acknowledgment act (3 Comp. Laws 1929, § 13333, Stat. Ann. § 26.604) it was held in *Reid* v. *Rylander,* 270 Mich. 263, that such certificate was not necessary, the notary's seal of office being sufficient.

Defendants also question the validity of the group acknowledgments and the authority of certain corporate officers to execute the restrictive agreement. Our *de novo* examination of the recorded instruments discloses that they were properly executed and acknowledged by the owners of more than 80 per cent. of the property covered by the restriction.

The policy was early established in this State that courts will uphold acknowledgments wherever pos-

sible and will not suffer conveyances or proof of them to be defeated by technical or unsubstantial objections. See *Morse* v. *Hewett,* 28 Mich. 481; *Nelson* v. *Graff,* 44 Mich. 433; *King* v. *Merritt,* 67 Mich. 194; and *Carpenter* v. *Dexter,* 8 Wall. (75 U. S.) 513 (19 L. Ed. 426).

Appellants argue that the restriction under consideration is void for uncertainty. This argument is based upon the following quotation from *Re Drummond Wren,* 1945 O. R. 778, Supreme Court of Ontario, No. 669–45, decided in October, 1945, where that trial court held that the phrase, "Land not to be sold to Jews or persons of objectionable nationality," was too indefinite to be enforceable. Mr. Justice Mackay said in that case:

"Counsel for the applicant contended before me that the restrictive covenant here in question is void for uncertainty. So far as the words 'persons of objectionable nationality' are concerned, the contention admits of no contradiction. The conveyancer who used these words surely must have realized, if he had given the matter any thought, that no court could conceivably find legal meaning in such vagueness. So far as the first branch of the covenant is concerned, that prohibiting the sale of the land to 'Jews,' I am bound by the recent decision of the House of Lords in *Clayton* v. *Ramsden,* (1943) L. R. A. C. 320 (1 All. E. R. 16), to hold that the covenant is in this respect also void for uncertainty; and I may add, that I would so hold even if the matter were *res integra.* The Law Lords in *Clayton* v. *Ramsden* were unanimous in holding that the phrase 'Jewish parentage' was uncertain and Lord Romer was of the same opinion in regard to the phrase 'of Jewish faith.' I do not see that the bare term 'Jews' admits of any more certainty."

This observation could not be made concerning the language of the restriction now under consideration.

It is difficult to see how language could be more certain than that employed, *i. c.,* "This property shall not be used or occupied by any person or persons except those of the Caucasian race."

No one could contend either that persons of the Mongoloid or Negroid races are embraced within the term "Caucasian," or that this term does not specifically exclude all other races. The covenant in question is not void on the ground that it is uncertain.

The principle that contracts in contravention of public policy are not enforceable should be applied with caution, and only in cases plainly within the reasons on which that doctrine rests. *Skutt* v. *City of Grand Rapids,* 275 Mich. 258, 264. In this same case this Court adopted the meaning of public policy from *Pittsburgh, C. C. & St. L. R. Co.* v. *Kinney,* 95 Ohio St. 64 (115 N. E. 505, L. R. A. 1917 D, 641, 643, Ann. Cas. 1918 B, 286):

" 'What is the meaning of "public policy?" A correct definition, at once concise and comprehensive, of the words "public policy," has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word "fraud" or the term "public welfare." In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

" 'Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people, —in their clear consciousness and conviction of what is naturally and inherently just and right between

man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct. is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.' ''

The public policy of this State as to racial discrimination has been expressed in various ways. In chapter 21 of the penal code, the civil rights sections prohibit such discrimination in public educational institutions and places of public accommodation, amusement, and recreation, Act No. 328, §§ 146–148 Pub. Acts 1931, (Comp. Laws Supp. 1940, §§ 17115-146—17115-148, Stat. Ann. §§ 28.343–28.345) and *Ferguson* v. *Gies,* 82 Mich. 358 (9 L. R. A. 589, 21 Am. St. Rep. 576) and *Bolden* v. *Grand*

*Rapids Operating Corp.,* 239 Mich. 318 (53 A. L. R. 183).

Discrimination by State mental institutions and in the public schools because of race or color is prohibited by statute. 2 Comp. Laws 1929, § 6922 (Stat. Ann. § 14.845) 2 Comp. Laws 1929, § 7156 (1), (Stat. Ann. § 15.76), and 2 Comp. Laws 1929, § 7368 (Stat. Ann. § 15.380).

Life insurance companies doing business in this State are prohibited from making any distinction or discrimination between white and colored persons. 3 Comp. Laws 1929, § 12457 (Stat. Ann. 1943 Rev. § 24.293).

It is also the public policy of this State, as expressed in decisions of this Court too numerous to mention, to permit and enforce certain restrictions upon the use and occupancy of real property. See authorities listed in 3 Callaghan's Michigan Digest, pp. 371–403.

Restrictions of a contractual nature are valuable property rights. They cannot even be taken under the power of eminent domain without compensation. *Allen* v. *City of Detroit,* 167 Mich. 464 (36 L. R. A. [N. S.] 890), and *Johnstone* v. *Railway Co.,* 245 Mich. 65, (67 A. L. R. 373). See, also, 122 A. L. R. 1464. These rules of property, which have existed during most of the life of the State, should not be brushed aside in the absence of strong and cogent reasons.

As indicated in *Dolby* v. *State Highway Commissioner,* 283 Mich. 609, 615 (117 A. L. R. 538):

"A recognized rule of property ought not to be overturned without the very best of reasons. *Lewis* v. *Sheldon,* 103 Mich. 102; *Pleasant Lake Hills Corp.* v. *Eppinger,* 235 Mich. 174."

In *Parmalee* v. *Morris, supra,* it was held that a restrictive covenant similar to the one now under consideration was not void as against public policy.

Restrictions against alienation are quite another matter. This Court pointed out the difference in *Porter* v. *Barrett,* 233 Mich. 373 (42 A. L. R. 1267) following the rule enunciated in *Mandlebaum* v. *McDonell,* 29 Mich. 78 (18 Am. Rep. 61), and held that a restriction prohibiting the sale of certain lands "to a colored person" was void.

The *Parmalee* and *Porter* authorities were followed in *Schulte* v. *Starks,* 238 Mich. 102. See annotations in 66 A. L. R. at page 531.

Defendants argue that a restriction prohibiting the use of property by others than those of the Caucasian race violates the due process clause of the Constitution of Michigan. (Art. 2, § 16) The applicability of this clause was not discussed in *Parmalee* v. *Morris, supra.* While we recognize that the concept of "due process" is incapable of exact definition, yet, ever since *Buck* v. *Sherman,* 2 Doug. (Mich.) 176, we have held that this constitutional right means that every person having property rights affected by litigation is entitled to notice, and a day in court, or a reasonable opportunity to appear and defend his interest. See *Chrysler Corporation* v. *Unemployment Compensation Commission,* 301 Mich. 351, and *Dation* v. *Ford Motor Co.,* 314 Mich. 152. Such rights were accorded the defendants in the instant case.

It is argued that the restriction in question violates the 14th Amendment to the Constitution of the United States. Appellees say that this argument was answered in *Corrigan* v. *Buckley,* 271 U. S. 323 (46 Sup. Ct. 521, 70 L. Ed. 969). We so read the *Corrigan Case,* although that decision partly turned on the inapplicability of the equal protection clause of the 14th Amendment to the District of Columbia, and the appeal was dismissed for want of jurisdiction.

Defendants argue that the language—"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws" (U. S. Const. am. 14, §1), means that the judicial acts of courts of a sovereign State are the acts of that State within the constitutional inhibition. They conclude therefrom that the decree in this cause was unconstitutional State action in that it deprived them of "the equal protection of the laws." To accept this reasoning would also at the same time deny "the equal protection of the laws" to the plaintiffs and prevent the enforcement of their private contracts.

We have never hesitated to set aside a law which was repugnant to the equal protection clause of the amendment but, on the other hand, we have never applied the constitutional prohibition to private relations and private contracts.

We were recently urged to apply a racial restriction to property under a claimed general plan, in *Kathan* v. *Stevenson*, 307 Mich. 485. This we declined to do. See, also, *Kathan* v. *Williams*, 309 Mich. 219, and *Gableman* v. *Department of Conservation*, 309 Mich. 416. We are not aware of any decision of courts of last resort, State or Federal, which have applied this constitutional prohibition to private agreements containing racial restrictive covenants.

The several *amici curiae* briefs indulge in considerable amplification and elaboration upon appellants' arguments on public policy and the constitutional questions involved in this appeal. In addition, these briefs contain valuable material with respect to the related social and economic problems.

We are impressed with the fact that the Negro population of Detroit has increased from 40,438 in 1920 to approximately 210,000 in 1944, and that it then was approximately 12 per cent. of the population of the city.

. The arguments based on the factual statement pertaining to questions of public health, safety and delinquency are strong and convincing. However, we must confine our decision to the matters within the record submitted to us and the questions raised in the briefs of the parties to the cause.

It is suggested that the intervention of a World War and the declarations of statesmen and international deliberative bodies now makes the device of restrictive covenants against minority racial groups a matter of concern and public policy rather than that of private contract, as was assumed by the court in the *Parmalee* decision in 1922. Some of the briefs go so far as to insist that the declarations of the Atlantic charter and the United Nations' conference at San Francisco are international treaties and have the effect of law.

We do not understand it to be a principle of law that a treaty between sovereign nations is applicable to the contractual rights between citizens of the United States when a determination of these rights is sought in State courts. So far as the instant case is concerned, these pronouncements are merely indicative of a desirable social trend and an objective devoutly to be desired by all well-thinking peoples. These arguments are predicated upon a plea for justice rather than the application of the settled principles of established law.

We direct attention to the differentiation made by Mr. Justice Roberts, between justice and law, in *Duncan* v. *Magette,* 25 Tex. 245, 252, decided in 1860. He said:

"I avail myself of the opportunity afforded by this application, to present my own views upon the foundation and force of this appeal to the sense of justice of the court, whether used as an influencing consideration, in interpreting and enforcing the rules of law, or directly urged as the basis of judicial action. A frequent recurrence to first principles is absolutely necessary in order to keep precedents within the reason of the law.

"Justice is the dictate of right, according to the common consent of mankind generally, or of that portion of mankind who may be associated in one government, or who may be governed by the same principles and morals.

"Law is a system of rules, conformable, as must be supposed, to this standard, and devised upon an enlarged view of the relations of persons and things, as they practically exist. Justice is a chaotic mass of principles. Law is the same mass of principles, classified, reduced to order, and put in the shape of rules, agreed upon by this ascertained common consent. Justice is the virgin gold of the mines, that passes for its intrinsic worth in every case, but is subject to a varying value, according to the scales through which it passes. Law is the coin from the mint, with its value ascertained and fixed, with the stamp of government upon it which insures and denotes its current value.

"The act of moulding justice into a system of rules detracts from its capacity of abstract adaptation in each particular case; and the rules of law, when applied to each case, are most usually but an approximation to justice. Still, mankind have generally thought it better to have their rights determined by such a system of rules, than by the sense of abstract justice, as determined by any one man, or set of men, whose duty it may have been to adjudge them.

"Whoever undertakes to determine a case solely by his own notions of its abstract justice, breaks

down the barriers by which rules of justice are erected into a system, and thereby annihilates law.

"A sense of justice, however, must and should have an important influence upon every well organized mind in the adjudication of causes. Its proper province is to superinduce an anxious desire to search out and apply, in their true spirit, the appropriate rules of law. It cannot be lost sight of. In this, it is like the polar star that guides the voyager, although it may not stand over the port of destination.

"To follow the dictates of justice, when in harmony with the law, must be a pleasure; but to follow the rules of law, in their true spirit, to whatever consequences they may lead, is a duty. This applies as well to rules establishing remedies, as to those establishing rights. These views will, of course, be understood as relating to my own convictions of duty, and as being the basis of my own judicial action."

In this appeal we are obliged to differentiate between public rights and private or contractual rights. The former is unquestionably the responsibility of the State, but the action of a State court in requiring or refusing enforcement of private contractual rights is, in our opinion, not within the prohibitions of the 14th Amendment. To hold otherwise would be to nullify many statutory enactments and overrule countless adjudicated cases. The unsettling effect of such a determination by this Court, without prior legislative action or a specific Federal mandate, would be, in our judgment, improper.

It is impossible, within the confines of this opinion, to distinguish and differentiate the numerous authorities cited pro and con in the various briefs. We do, however, direct attention to a most recent annotation of authorities on the subject in 162 A. L. R. 180 *et seq.*, which follows the opinion in

*Mays* v. *Burgess,* 79 App. D. C. 343, (147 F. [2d] 869), decided January 29, 1945; certiorari denied, 325 U. S. 868 (65 Sup. Ct. 1406, 89 L. Ed. 1987); rehearing denied, 325 U. S. 896 (65 Sup. Ct. 1567, 89 L. Ed. 2006). See, also, 36 Harvard Law Review, December, 1922, .p. 220; 12 University of Chicago Law Review, February, 1945, p. 198; 33 California Law Review, March, 1945, p. 5; 30 Minnesota Law Review, March, 1946, p. 219.

What we must determine in this appeal is whether we shall now overrule *Parmalee* v. *Morris, supra.*

We are guided in our consideration of this problem by our statements in the recently decided case of *Bricker* v. *Green,* 313 Mich. 218 (163 A. L. R. 697).

After a careful study, we are not persuaded that the rule laid down in the *Parmalee Case* was wrong, or is wrong now. It is controlling with respect to the instant case.

The decree entered by the trial court is affirmed, with costs to appellees.

CARR, C. J., and BUTZEL, SHARPE, BOYLES, REID, NORTH, and DETHMERS, JJ., concurred.