EVELYN RICE, appellant, v. SIOUX CITY MEMORIAL PARK CEMETERY, Incorporated, et al., appellees.

No. 48304.

(Reported in 60 N.W.2d 110)

148

Neil R. McCluhan, of Winnebago, Nebraska, and Kindig & Beebe, of Sioux City, for appellant.

Shull & Marshall and Harper, Gleysteen & Nelson, all of Sioux City, for appellees.

Larson, J.—Plaintiff commenced her action for damages against the defendants by filing a petition in three counts, which was later twice amended and still later ordered recast. In a case of the same entitlement found in 102 F. Supp. 658, the petition is set out in full. In this opinion by Judge Graven the case was remanded to the state court for final adjudication on the issues, due to a jurisdictional question. The action against the individual defendants was dismissed below and no appeal is taken from that decision of the court.

Plaintiff in her petition alleges that on or about August 17, 1951, she entered into a written contract, Exhibit A, for the purchase of three cemetery lots belonging to defendant corporation, one lot to be used for the burial of her deceased husband, Sergeant Rice, whose body was being shipped home from Korea. This contract contains a racial restrictive clause and provides in part as follows:

"M. No. 1335.
"Sioux City Memorial Park Cemetery, Inc.

"*This contract,* made at Sioux City, Iowa, on this 17th day of August, 1951, between the Sioux City Memorial Park Cemetery, Inc. (owners and developers of Sioux City Memorial Park), its successors and assigns, Party of the First Part (seller)

150

and Mrs. Evelyn Rice, of Winnebago, Nebr., Party of the Second Part (purchaser), Witnesseth:

"That the said Party of the Second Part agrees to purchase from the said Party of the First Part the following: Right of Sepulture in and to So. ½ (spaces 4-5 & 6) Lot 58 in Section Veterans, Sioux City Memorial Park, a burial ground with permanent care as hereinafter provided, a plat of which has been or will be recorded with the Recorder of Deeds in Woodbury County, Iowa, with privilege to exchange said lot before Sepulture for any other unsold lot of the same price and privilege at time of transfer * * *.

"This agreement is assignable only with the consent of seller, and burial privileges accrue only to members of the Caucasian race, and before any burial can be made the grave space or spaces so used shall be paid in full. * * *

"This contract is subject to the rules and regulations and by-laws of the Sioux City Memorial Park Cemetery, Inc. The Party of the Second Part agrees to purchase any grave markers necessary from the Party of the First Part. Only bronze markers may be used in said cemetery, and must be purchased from the Party of the First Part subject to its rules and regulations.

"No condition, regulation, or agreement other than those printed hereon or contained in Sioux City Memorial Park Cemetery, Inc., rules and regulations shall be binding upon the seller, and this agreement shall not become effective until executed and approved by an executive officer of the Sioux City Memorial Park Cemetery, Inc."

Plaintiff alleged that her deceased husband, Sergeant John Rice, killed in combat on active duty in Korea, had $^{11}\!/_{16}$ Winnebago Indian blood and $^{5}\!/_{16}$ white blood, and that defendant cemetery refused to permit the body of her deceased husband to be lowered into the ground, after graveside services were held, caused the body to be removed from the grave site and advised her that the refusal was because "he was not a Caucasian."

Plaintiff further alleged that defendant cemetery published a pamphlet explaining its action in refusing the burial, which caused her humiliation and suffering. In each count she asked judgment in the sum of $60,000. The pamphlet filed as Exhibit C is in part as follows:

"THE TRUTH ABOUT THE SGT. RICE INCIDENT.

"In fairness to our Lot Owners and the citizens of Sioux City and vicinity, who are interested in the Memorial Park, we feel that the many false statements that have been published about this incident should be clarified by a frank statement of the truth:

"1. Contrary to general belief and newspaper publicity the Sioux City Memorial Park did *not solicit* the burial of Sgt. Rice.

"Mr. D. T. Boyd, the undertaker, of South Sioux City, Nebraska, called and made the appointment to meet Mr. Ben Willey, Sales Manager, at the Park, on August 17, 1951, after, as we were later informed, they had been turned down by two or three other cemeteries. Mr. Boyd, Mrs. Rice and her sister (Mrs. Rice and her sister are both white, but married to Indian brothers) met Mr. Willey at the Park, and Mrs. Rice purchased three spaces on an installment basis and arranged for the burial of Sgt. Rice. Nothing was said about Sgt. Rice being Indian or that Mrs. Rice lived on the Indian Reservation when the lot was purchased, or prior to the funeral. On the 18th day of August a copy of the contract signed by Mrs. Rice was mailed to her containing the restriction limiting burial to members of the Caucasian race. The funeral was not held until August 28. Mrs. Rice had had her copy of the contract for ten (10) days, which was ample time for her to inform herself of its contents and restrictions. Mr. Boyd knew, or should have known, about the restriction, as an undertaker of this community whose business is dealing with cemeteries, especially as we have been informed that the burial was turned down by two or three other cemeteries before coming to the Memorial Park. Contrary to publicity, the service by the Catholic priest at Memorial Park was not interrupted and the family had already left the grave site when Mr. Willey asked the undertaker and was informed that the deceased was an Indian. The body was *never* lowered into the ground. The first notice the Park had of the fact that the deceased might be an Indian was that practically all of the mourners at the funeral were Indians.

"2. The present Owners and Officers of the Park have no

racial prejudice and were not responsible for the restriction to only members of the Caucasian race.

"3. Every contract and deed since the cemetery was started carries this restriction.

"4. Dr. R. S. McNeish, of the National Museum at Ottawa, Canada, and other Canadian archæologists have reported definite proof that American Indians are descended from Wild Mongolian Nomads that came to North America from Asia by way of Alaska. In other words, the American Indian is not of Caucasian descent, to the best of our available information.

"If the burial of Sgt. Rice had been permitted, every Lot Owner in the Park could have recourse against the corporation for damages for breach of contract. The officers of the Park are legally bound to enforce and protect its contracts and contract holders—such proceedings could have financially wrecked the Park. Any removal of this restriction would have to be by agreement of all lot owners, which would be a practical impossibility.

"5. The officers of the Park have never at any time retracted from the position first taken, as they could not legally do so.

"6. The apology so publicized was simply an expression of regret that the officers were legally bound to take the position they did.

"7. Contrary to reports in the press, the officers of the Park did not offer Mrs. Rice any lot in the Memorial Park. The City Council of Sioux City offered any lot in any Sioux City owned cemetery. Mrs. Rice had already contracted for space in Memorial Park which made such an offer on behalf of the Memorial Park unnecessary. As she could not legally use the space already contracted for, you can see such an offer would be meaningless. We have had many inquiries as to why we did not publicly defend our position during the height of the publicity that was given to this incident. Our failure to do so was in deference to the request of many businessmen and citizens of Sioux City who wished to end the publicity as quickly as possible, and also to our knowledge of the fact that under this mob hysteria any statements made by us, as had been demonstrated, would not be fairly reported.

"8. The restriction to members of the Caucasian race is

almost as old as the cemetery business and has come down with the development of the cemetery business. This restriction is in probably 90 per cent of the private cemeteries in the United States, including Forest Lawn in California and Graceland Park in Sioux City. Private cemeteries have always had a right to be operated for a particular group, such as Jewish, Catholic, Lutheran, Negro, Chinese, etc., not because of any prejudice against any race, but because people, like animals, prefer to be with their own kind. * * *

"We submit the above for your fair and unbiased appraisal.

> "THE MEMORIAL PARK
> "Sioux City, Iowa."

Both defendants and plaintiff moved for an adjudication of substantially the same points of law under rule 105, R. C. P., and the court ruled:

That the racial restrictive clause in the contract, Exhibit A, is not void but is unenforceable as a violation of (a) The Fifth Amendment to the United States Constitution; (b) the Fourteenth Amendment to the United States Constitution; (c) sections 1 and 6 of Article I of the Constitution of the State of Iowa, and (d) Public policy of the State of Iowa and of the United States Government;

That the restrictive clause in the contract, Exhibit A, refers to the race of the person or thing to be buried, rather than to the race of the owner of the lot;

That a person alleged to be of $11/16$ Winnebago Indian and $5/16$ white blood is not, as a matter of law, a person of the Caucasian race within the meaning of the term as used in the contract;

That the action of a state or federal court in permitting a defendant to stand upon the terms of its contract and to defend this action in court would not constitute state or federal action contrary to the Fifth and Fourteenth Amendments to the United States Constitution;

That the acts of the defendants alleged do not constitute a violation of "public policy" as a matter of law;

That the term "Caucasian race" as used in the contract,

Exhibit A, is not "ambiguous, unintelligible and meaningless"; and

That the United Nations Charter has no legal effect as to legality or illegality of the provisions of the contract involved herein, or of the rights of the parties hereto.

We denied an application for interlocutory appeal and thereafter on December 6, 1952, defendants made a second application to the district court to adjudicate points of law remaining. The court found this action was originally premised upon an alleged breach of contract, and as elements of damage, plaintiff listed her injury as humiliation, mental distress, etc., increased by (1) the moving of the body after it was ready to be lowered into the ground and (2) by the publication of a pamphlet explaining the incident complained of by plaintiff. The court further found no independent tort action involved and having ruled against plaintiff on her claim for breach of contract, there was nothing left upon which to base damages, the only allegation remaining in the petition, after all allegations of wrongdoing were removed, by the court's rulings on points of law. We agree.

Plaintiff relies upon and argues six alleged errors, but her main contention is that the court erred in holding, as a matter of law, that the racial restrictive clause in the admitted contract was not void, and that the action of the court in permitting the defendants to stand upon its terms and defend thereunder this action for damages in court would not amount to nor constitute state or federal action contrary to the Fifth Amendment or the Fourteenth Amendment to the United States Constitution or the Constitution of Iowa (section 1, Article I, or section 6, Article I).

We shall discuss this contention first and address ourselves to the contract rather than tort features of plaintiff's complaint. The complaint sounding in tort will be later considered.

■ I. It is strongly contended by plaintiff that the whole field of law on the subject of restrictive covenants was completely changed by pronouncements of the United States Supreme Court in the cases of Shelley v. Kraemer, 334 U. S. 1, 68 S. Ct. 836, 92 L. Ed. 1161, 3 A. L. R.2d 441, and Hurd v. Hodge,

334 U. S. 24, 68 S. Ct. 847, 92 L. Ed. 1187, which hold in effect that affirmative action of state courts by granting injunctions, specific performance and other active aids to the enforcement of restrictive covenants based on color or race was state action and violated the Fifth and Fourteenth Amendments to the United States Constitution. In this group of cases it is to be noted that the state has lent its power in support of the actions of private individuals or corporations and, of course, in so doing has clothed the private acts with the character of state action. While we must recognize an evolution of our society as disclosed by these recent decisions, all of the previous decisions may be distinguished from our present case in that they disclose the exertion of governmental power *directly* to aid in discrimination, or other deprivation of right. Certainly that factor is not presented here, where the state has maintained neutrality. But plaintiff would have us go one step further than the United States Supreme Court and declare any private contract, which contains any restrictive covenants, void as to the covenants. She is asking more. She asks us to reform the contract voluntarily agreed to with another private party. She asks that we remove the restrictive covenant in her contract which she repudiates and permit her to recover damages from the other party; in other words, extend the theory announced in the Shelley v. Kraemer and Hurd v. Hodge cases, supra, to indirect as well as direct support of private agreements containing restrictive covenants; to bar the recognition of such clauses in contracts between private parties even though no active aid is given their enforcement. This theory the district court would not adopt and we think properly declined to do so. Our sympathy must not be allowed to carry us to the aid of either party in circumstances of this nature unless the restriction is clearly one against public policy. It may be desirable to hold that state action can be discerned in any case where the state has tolerated discrimination by inaction, or otherwise, in matters of public importance, and we are in sympathy with the ideals of race equality. But there is danger in attempting a remedy by such constitutional expansion. Invocation of the constitution then might depend upon a balance of two asserted values—the privilege of the private corporation versus the right of the plaintiff

156

to equality of treatment which is another well-known constitutional safeguard. It must be clear that a clash would result between such expansion of the Fourteenth Amendment and the decisions of long standing in the Civil Rights Cases. 109 U. S. 3, 3 S. Ct. 18, 27 L. Ed. 835. Both demand that the states protect the rights defined in the amendment against the wrongful actions of private individuals. This most states do by appropriate legislation, and it is just and proper that state authorities furnish appropriate means of extending these moral rights into areas when they have not heretofore been asserted rather than to try an extension of the coverage of the Fourteenth Amendment to fields that will abridge other individual rights and violate other constitutional guarantees.

It is well to mention here that the proper state authority, the 1953 Iowa legislature, in chapter 84, Acts of the Fifty-fifth General Assembly; section 1 and section 8, did expand the Iowa civil rights law to cover just such incidents as arose in this case, *but* it is also worthy of note that by exceptions this legislation did not abridge desirable individual rights of restriction in church and fraternal private burial places. Such proper discretion could not occur under plaintiff's urged expansion of constitutional construction.

It seems to us that the unquestioned value of the present system prescribes the limits to this expanding concept of state action. As said in the case of Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, 534, 87 N.E.2d 541, 551, 14 A. L. R.2d 133, 145, certiorari denied, 339 U. S. 981, 70 S. Ct. 1019, 94 L. Ed. 1385: "The unquestioned value of that system [state responsibility] suggests the limits to the expanding concept of State action, which has hitherto been found only in cases where the State has consciously exerted its power in aid of discrimination or where private individuals have acted in a governmental capacity so recognized by the State."

█ In order to seek money damages, plaintiff seeks to justify her repudiation of a portion of her contract and recover on a breach of the new agreement, but admits that Iowa had not seen fit to declare such private cemeteries within the "civil rights" (chapter 735, Code, 1950) laws of this state. Having named such things as lodging houses, restaurants and places of

amusement, the defendants were not acting in violation of Iowa law, and the expression "expressio unius est exclusio alterius" is applicable here.

Our conclusion then must be that the moral ends advanced by plaintiff will not justify the means she sought to obtain them. Defendants cannot be held to answer in damages for its contractual provisions under the equal protection clauses of either Federal or State Constitutions. Plaintiff did not strenuously argue that the State Constitution in section 1, Article I, and section 6, Article I, did more than re-enunciate the restrictions of the Fifth and Fourteenth Amendments to the United States Constitution. The problem is the same under each constitution and our decision must necessarily be the same in each case. Prohibitions relating to cases of this kind contained in the Fifth and Fourteenth Amendments to the United States Constitution and the State Constitution, sections 1 and 6 of Article I, related only to state action. It is clear that state action as referred to here has been only expanded to direct action by the legislative, the executive, the judicial authorities or any person or group exercising a governmental function, to aid in the enforcement of restrictive or discriminating acts or agreements. For the reasons set out we can expand it no further and therefore find no error in the lower court's determination of these points of law.

II. But plaintiff further urges that the restrictive covenants violate "public policy" and the treaty embodied in the Charter of the United Nations.

It will suffice to say that that treaty has no application to the private conduct of individual citizens of the United States. It is true a principle was enunciated in that treaty but claims or fears that state laws have been abrogated by the provisions of the Charter of the United Nations have been dissolved by the California and Michigan courts. In Sipes v. McGhee, 316 Mich. 614, 628, 25 N.W.2d 638, 644, a case reviewed by the United States Supreme Court, there was a reversal on constitutional grounds but no criticism of the state court's expression as to the general law relative to treaties. The Michigan Supreme Court said: "We do not understand it to be a principle of law that a treaty between sovereign nations is applicable to the contractual rights between citizens of the United States when a

158

determination of these rights is sought in the State courts. So far as the instant case is concerned, these pronouncements [Arts. 55, 56, United Nations Charter] are merely indicative of a desirable social trend and an objective devoutly to be desired by all well-thinking peoples." With this statement we agree.

The Supreme Court of California in 38 Cal. 2d 718, at 724, 242 P.2d 617, at 622, reviewing the decision in Sei Fujii v. State of California, Cal. App., 217 P.2d 481, held: "We are satisfied, however, that the charter [United Nations] provisions relied on by plaintiff were not intended to supersede existing domestic legislation, and we cannot hold that they operate to invalidate the Alien Land Law."

We also must come to the conclusion here that desirable as these principles announced in the charter may be, they do not have the force or effect of superseding our state laws relating to contracts, and must therefore hold that the provisions of the United Nations Charter have no bearing on the case before the court.

Plaintiff lays great stress on her claim that a racial restriction in a private agreement such as we have here must be declared void as violating public policy. This is a typical argument in cases of this kind and admittedly has caused courts some difficulty. The greatest of these difficulties is that of determining the meaning of "public policy." Plaintiff refers to several cases where the courts have held against racial discrimination in public schools, in transportation and food establishments, and points to this as Iowa's public policy. A closer examination of these cases discloses that this designated public policy was not set by the courts but by the legislative branch. It is true that in interpreting various civil rights acts and other police power enactments the courts do and have expressed the public policy of the state, as is indicated by the people through the legislature. In the case of Richmond v. Dubuque & Sioux City R. Co., 26 Iowa 191, 202, we said: "But further than this, the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

In the case of Liggett v. Shriver, 181 Iowa 260, 265, 164 N.W. 611, 612, we said: "We must look to the Constitution, statutes, and judicial decisions of the state to determine its public policy, and that which is not prohibited by statute, condemned by judicial decision, nor contrary to the public morals, contravenes no principle of public policy." See also Sipes v. McGhee, supra.

In general throughout the United States, covenants or agreements restricting real property from ownership or occupancy by persons of a certain race, or by anyone not of the Caucasian race, have been held not contrary to public policy. See 3 A. L. R.2d, page 486, for annotations.

We are in doubt that the restrictive clause here contravenes sound public policy, and must therefore hold that there has been no such violation of public policy such as would justify the holding of the restrictive agreement void in the contract.

It is fundamental in our law that a private individual may, unless expressly forbidden by police power enactments, deal freely with whom he pleases, and his reasons or policy are not the concern of the state. The state may not aid him in certain of his restrictive or arbitrary agreements, and so here if plaintiff had herself lowered her deceased husband's body into the ground, in violation of her agreement with defendants, the State would have had to deny defendants aid in restraining her, nor could it have helped in punishing her for violating that agreement.

III. Plaintiff further contends that the words used in the contract are not clear, but are ambiguous, and should not have been decided by the court as a matter of law and that certain questions regarding the meaning of the terms used in the contract should have been submitted to the jury. She contends first, that the contract restriction refers to the person buying the lot and not to the person to be buried in the lot. Next, she contends the term "Caucasian" as used in the contract was too vague and indefinite to be enforceable and should have been left to the jury to determine whether or not plaintiff's husband qualified. She also complains that the court should not as a matter of law determine the question of whether one alleged to be of $1\frac{1}{16}$

Indian blood was or was not a Caucasian under the contract, Exhibit A.

 We are unable to follow the plaintiff's argument for it is too well settled in this state for further debate that the validity and construction of a written contract agreement is a matter of law for the court to decide and is not a question of fact for the jury.

In 53 Am. Jur., Trial, section 268, page 226, we find the general rule as follows: "The question whether a writing is, upon its face, a complete expression of the agreement of the parties is one for the court, and subject to qualifications where the contract is uncertain and ambiguous * * * the general rule is that where a contract has been reduced to writing, its interpretation, construction, or legal effect is for the court and not for the jury. This is true * * * provided the writings express the complete agreement of the parties and the language used is clear, plain, certain, undisputed, unambiguous, unequivocal, and not subject to conflicting inferences, or where the only doubt as to its meaning arises from the language the parties used, and not from intrinsic matters. In other words, where a clear meaning can be ascertained without resort to intrinsic facts, the interpretation of a writing is for the court."

 Was the wording of the contract amply clear, plain and unambiguous? It is difficult to believe that the wording of the contract, "* * * burial privileges accrue only to members of the Caucasian race" meant anything else than the race of the one to be buried. Certainly not to the one that purchased the lot. This was the only reasonable determination of the intention of the restrictive clause in this agreement.

 We are also clear that a person of $11/16$ Indian blood is as a matter of law not a Caucasian. The word "Caucasian" is not a strictly scientific term but is interpreted according to its generally accepted meaning. It is sufficient to say that one admittedly of $11/16$ Indian blood is not a Caucasian and it would have been error to have submitted the question to a jury. No doubt where the percentage is in question or is disputed, a jury might determine the matter, but that is not the fact in this case. We have been cited no authority, nor have we found any, which

holds that one having greater than 50% Indian or Negro blood is a Caucasian. In United States v. Balsara, 2 Cir., N. Y., 180 F. 694, 696, the court said: "We think that the words refer to race and include all persons of the white race, as distinguished from the black, red, yellow, or brown races, which differ in so many respects from it. Whether there is any pure white race and what peoples belong to it may involve nice discriminations, but for practical purposes there is no difficulty in saying that the Chinese, Japanese, and Malayans and the American Indians do not belong to the white race."

 As popularly understood by the common man a Caucasian and white person is synonymous, and is sufficiently definite to be recognized legally and is not void for uncertainty. Wadia v. United States, 2 Cir., N. Y., 101 F.2d 7.

We agree with the decision of the district court that the language used in the contract, Exhibit A, was amply clear, certain and unambiguous, and hold that the construction to be placed on the contract was for the court and not for the jury. See Rath v. Schoon, 192 Iowa 180, 182 N.W. 180; Seibel v. Commonwealth Life Ins. Co., 194 Iowa 701, 190 N.W. 173; Comptograph Co. v. Burroughs Adding Mach. Co., 179 Iowa 83, 159 N.W. 465; Weitz' Sons v. United States Fid. & Guar. Co., 206 Iowa 1025, 219 N.W. 411; Equitable Life Ins. Co. v. Johnston, 222 Iowa 687, 269 N.W. 767, 108 A. L. R. 257; Hubbard v. Marsh, 241 Iowa 163, 40 N.W.2d 488; Farrell v. Wallace, 161 Iowa 528, 143 N.W. 488; Lamson v. Horton-Holden Hotel Co., 193 Iowa 355, 360, 361, 185 N.W. 472, 474, 26 A. L. R. 465; 12 Am. Jur., Contracts, section 232, page 756.

In Lamson v. Horton-Holden Hotel Co., supra, we said: "No fraud or misrepresentation is charged or proven on either side. * * * If there be neither fraud nor mistake justifying equitable interference, the terms of the contract as written must prevail." A misconstruction of a contract written is a mistake of law and not of fact.

We find here no allegations as to misrepresentation, fraud or deceit in the obtaining or the execution of the agreement between the plaintiff and the defendant corporation. The only allegation that slightly tends to negative the terms of the written

agreement or question the meeting of minds was an allegation in plaintiff's petition that "the defendant knew or reasonably should have known that Sergeant Rice was a Winnebago Indian." This allegation does not go so far as to claim a waiver of the terms of the written contract, in fact it does no more than suggest another separate agreement or a misunderstanding of the terms of the later executed agreement.

In Blackledge v. Puncture Proof Retread Co., 190 Iowa 1303, at 1307, 181 N.W. 662, 663, Judge Evans, speaking for the court, said: "While it is true, as an abstract proposition of law, that an independent oral contract may be entered into between the parties to a written contract, and contemporaneously therewith, it is also true that such oral contract must be independent in fact, and must not be a contradiction, modification, or qualification of the written contract, either as to its enforcement, its consideration, or its executory obligations."

We have recently held such an allegation as to defendant's knowledge was insufficient and proof thereof improper under the parol-evidence rule. Des Moines v. West Des Moines, 244 Iowa 310, 314, 56 N.W.2d 904, 906.

IV. The remaining contention of plaintiff involves her Count I, which sounds in tort. Her error, No. 3, contends that the court erred in holding as a matter of law that the question of damage resulting from the moving of the body and for the publication of the pamphlet, Exhibit C, could not be presented to the jury in view of the prior adjudication of law points. The foundation of all of plaintiff's theories of action is a claimed breach of contract between her and the cemetery corporation. After deleting the restrictive clause which she claims void, her damage action depends upon defendants' breach and her consequent suffering and damage.

Conduct that is merely a breach of contract is not a tort. The contract, however, may establish a relationship demanding the exercise of proper care, and then a tortious and intentional violation of that requirement might give rise to a tort liability. Peitzman v. City of Illmo, 8 Cir., Mo., 141 F.2d 956; Smith v. Weber, 70 S. D. 232, 16 N.W.2d 537.

Plaintiff here asks the court to construe the contract in such a way that defendants' refusal to bury plaintiff's de-

ceased husband could be considered wrongful or tortious. In other words, upon the construction of the relationship of the parties under the contract would depend the question of whether or not a tort had been committed against the plaintiff. Excepting for the contract, the refusal of defendants to bury plaintiff's deceased husband could not in any way be considered wrongful or tortious. It must therefore be clear that unless the contract was reformed by deleting the restrictive clause, whereby defendants would be guilty of an intentional breach of contract, and intentionally committing a wrongful act against plaintiff, under their contract relationship, no tort liability would be incurred by defendants' acts, first, in refusing to bury plaintiff's deceased husband, and second, in explaining their alleged right and reasonable action in the pamphlet. No contention is made that plaintiff has stated a cause of action in defamation of character nor did she claim an independent action based upon the removal of the body from the grave site. The court therefore correctly held there was no jury question under an independent tort action, but that recovery under the tort contention depended upon her success in pleading and proving a breach of contract relationship. This being determined adversely to her by the court, her tort claim must also fail.—Affirmed.

All JUSTICES concur.