## CHARLESTON.

*Ex Parte* CLIFTON HUDGINS.

Submitted April 27, 1920. Decided May 18, 1920.

CONSTITUTIONAL LAW—*Statute Defining "Vagrancy" Held an Unconstitutional Restraint Upon Personal Liberty.*

Section 2 of chapter 12, Acts 1917, Second Extraordinary Session, providing that every able bodied male resident of this state between the ages of sixteen and sixty years, except *bona fide* students during school term, who shall fail or refuse to regularly and steadily engage for at least thirty-six hours per week in some lawful and recognized business, profession, occupation or employment, shall be held to be a vagrant and be guilty of a misdemeanor, and punished as therein provided, regardless of the financial ability of such person to maintain himself and his dependents without performing such labor, and regardless of his ability to obtain such employment except as therein provided, is unconstitutional and void as imposing unnecessary and unreasonable restraint upon personal liberty, and as having no just or reasonable relation to the things generally comprehended within the police power of the state.

(LYNCH, JUDGE, absent).

Habeas corpus by Clifton Hudgins against S. A. Daniel, Sheriff, etc.

*Petitioner discharged.*

*Litz & Harman* and *Joseph M. Crockett,* for petitioner.
*G. L. Counts,* Prosecuting Attorney, for respondent.

MILLER, JUDGE:

Petitioner seeks his discharge from custody, the petition and return of the officer showing that he is being restrained of his liberty by the judgment of conviction by confession and sentence upon two indictments found by the grand jury on May 13, 1920, the first, number one, charging that being then and there an able bodied male resident of McDowell County, West Virginia, between the ages of sixteen and sixty years, and not being then and there a bona fide student during school term, he did unlawfully fail and refuse to regularly and steadily engage for at least thirty-six hours for one week, beginning March 29,

1920, and ending April 5, 1920, in some lawful and recognized business, profession, occupation and employment, whereby he might contribute to the support of himself and those legally dependent upon him; the second, number two, charges him with a like offense committed during the week beginning April 5, 1920, and ending April 12, 1920.

The grounds alleged and relied on are: first, that the time prescribed within which the statute was to remain in effect had ·expired by limitation when petitioner is alleged to have committed the several offenses; second, that the said act is unconstitutional and void, being violative; (1) of the Thirteenth amendment of the Constitution of the United States, providing that: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction;" (2) of Section 1, Article 3, Bill of Rights, of the Constitution of West Virginia, saying that: "All men are, by nature, equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely: the enjoyment of life and liberty, with the means of acquiring and possessing property, and of pursuing and obtaining happiness and safety;" (3) Section 3, Article 1, of the Constitution of West Virginia, providing: "The provisions of the Constitution of the United States, and of this State, are operative alike in a period of war as in time of peace, and any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good government, and tends to anarchy and despotism."

The statute on which the indictments were found, is section 2 of chapter 12 of the Acts 1917, Second Extraordinary Session, and so far as pertinent to the questions presented, is as follows: "Section 2. From the time this act becomes effective, and thenceforward until six months after the termination of the present war between the United States and the Imperial German government, any able bodied male resident of this state between the ages of sixteen and sixty, except *bona fide* students during school term, who shall fail or refuse to regularly and steadily engage for at least thirty-six hours per week in some

lawful and recognized business, profession, occupation or employment, whereby he may contribute to the support of himself and those legally dependent upon him, shall be held to be a vagrant within the meaning and effect of this act, and shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not more than one hundred dollars for each offense, and as a part of such sentence and punishment shall be by the trial court ordered to work not exceeding sixty days upon the public roads or streets, or upon some other public work being done by. and in the county in which such person shall be convicted, or by any municipality therein."

The judgment for the first offense was confinement in the jail of the county at hard labor for thirty days, and a fine of $25.00, the labor to be performed on the public roads, and if the fine was not paid, the imprisonment and labor was to continue until the fine should be paid, at the rate of $1.00 per day. And for the second offense the judgment of imprisonment was for forty-five days, commencing at the end of the term imposed under the first indictment, and $35.00 fine, with like conditions if this fine was not paid.

The petitioner alleges, and there is no traverse of the fact, that at the outbreak of the war he was a soldier in Company "K", Second West Virginia Infantry, and remained there until the summer of 1917, when he was discharged for physical disability; that later, February 4, 1918, he enlisted in the army of the United States, and was assigned to the Signal Corps, 79th Division, then in training at Camp Meade, Maryland, and in May 1918, was transported over seas, and was serving in said division and participated in the battle of St. Mihiel, various battles around Verdun, and the Meuse-Argonne offensive, and was with the division at Sedan when actual hostilities between the United States and the Imperial German government ended November 11, 1918; that in May 1919, he was discharged, and was informed that all the soldiers who like himself had enlisted for the duration of the war had long since been discharged, and the army disbanded.

The military services rendered by petitioner are perhaps not very material, but they should not be overlooked in the administration of a law of this nature, limited as it is to the dura-

tion of the war, which the petitioner contends had ended before the offenses with which he was charged were committed. Whether the war had then ended within the provisions of this act, we need not decide, for we have reached the conclusion that the act is unconstitutional and ought to be so declared.

The act is not conditioned on whether or not the offender has other means of support, or dependents, for if no dependents, by the provisions of the act, no payments need be made by the county or municipality on account of his labor. At the common law vagrancy consists in going about from place to place by a person without visible means of support, who is idle, and who, though able to work for his or her maintenance, refuses to do so, but lives without labor or on the charity of others. 29 Am. & Eng. Enc. Law, 568; *Ex parte Strittmatter,* (Tex.), 137 Am. St. Rep. 937, note 944; *Id.* 21 Ann. Cas, 477, note 478. But as these authorities point out, in the face of the many different statutes in this country, the common-law rule is of little importance; and it is generally conceded that within certain broad limitations, the legislature may by statute define vagrancy and impose punishment for the offense.

The broad ground taken by petitioner and his counsel is that the statute sought to be enforced against him is an unjust and unreasonable restraint upon his personal liberty, guaranteed by the State and Federal Constitutions. What is personal liberty under the law? As defined by Blackstone, it "consists in the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." "In organized society," says Cooley, Constitutional Limitations, (7th ed.), 483, "liberty is the creature of law, and every man will possess it in proportion as the laws, while imposing no unnecessary restraints, surround him and every other citizen with protections against the lawless acts of others." The qualifications and restraints which the law may properly impose on personal liberty, classed according to their purpose, as said by the same high authority, are; first, those of public, second, those of private nature. The first class involves the relative duties and obligations of a citizen to society and his fellow-citizens, and is sub-divided by Mr. Cooley as follows: "(1) Those imposed

to prevent the commission of crime, which is threatened; (2) those in punishment of crime committed; (3) those in punishment of contempts of court or legislative bodies, or to render their jurisdiction effectual; (4) those necessary to enforce the duty citizens owe in defence of the state; (5) those which may become important to protect the community against the acts of those who, by reason of mental infirmity, are incapable of self-control. The second class are those which spring from the helpless or dependent condition of individuals in the various relations of life." Cooley's Constitutional Limitations, 484.

Tested by these general rules, what may be properly determined of the statute here involved? To bring it within these limitations it must have some reasonable relation to one or more of the subjects over which the state may properly exercise its police power. Manifestly the enactment of the statute was intended as a war measure, for it is limited in its effect to the period of the war and six month after termination thereof. The state, under our Constitution has no power to declare war; the war power, so far as it exists under the Constitution and laws of this state, is in the governor as commander-in-chief of the military forces, except when called into the service of the United States, to call out such forces to execute the laws, suppress insurrection, and repel invasion. Constitution, Section 12, Article 7; sections 5 and 6, chapter 18, Code. The statute, in no way relates to the raising or organization of the military forces of the state, for state or federal purposes.

It is apparent that the Legislature has attempted to justify the measure on the theory that the persons against whom it was directed were, or might become, charges upon the public, but by its terms it is limited to the period of the war, and six months thereafter; and that during that term the productive resources of the state should be brought up to the highest standard, for war purposes. With the state, however, this could amount only to a semblance of right. While greater production during the period of the war might be desirable, is that a subject with which the state had the right to deal? We think not. Certainly not by accusing all citizens coming within its provisions with vagrancy, and as criminals, without reference to their ability to support and maintain themselves and their depend-

ents without work. And as further evidence that the protection of the state against vagrancy was not the real object of the statute, it elsewhere provides that, "in no case shall the possession by the accused of money, property or income sufficient to support himself and those legally dependent upon him be a defense to any prosecution under this act;" and furthermore, that, "in no case shall the claim by the accused of inability to obtain work or employment be a defense to any prosecution hereunder, unless it be proved that the accused promptly notified the proper representative of the state council of defense of his inability to obtain employment, and requested that work or employment be found for him, and that such employment was not furnished him." It is suggested in argument that the state council of defense had completed its work and been discharged long before the alleged offenses were committed by defendant. However, that fact does not appear in the record, and it is immaterial in our view of the law.

So the purpose of the statute was not to subserve any of the purposes for which a citizen may rightfully be deprived of his liberty. Its effect was to require every able bodied male resident of the state, between the ages specified, regardless of his financial ability, to work, not simply long enough each day of the week to acquire means of support for himself and his dependents, but for the number of hours required. It is made applicable alike to young and old within these ages. If a citizen, say of fifty or fifty-five years of age, had worked diligently earlier in life, and had laid up a competency with which to support himself and his dependents in his or their stations of life, that he might for the rest of his days live in comparative ease and freedom from the burdens of his earlier years, he could not defend himself on that account nor escape the penalties imposed for a violation of the statute, characterizing him as a vagrant and punishable as such. Can such a statute find justification in the police power of the state? Though this power has never as yet, and probably never will be accurately defined, yet under the Constitution it is confined to matter relating to the public health, the public morals, and the public safety. *Booth* v. *People*, 186 Ill. 43, 78 Am. St. Rep. 229, and note 235; *State* v. *Peel Splint Coal Co.*, 36 W. Va. 802. And

this power must be exercised so as not to impose unjust or unreasonable restraints upon personal liberty. *Lawrence* v. *Barlow,* 77 W. Va. 289. Where the statute undertakes to impose restraints on liberty, it should be confined to the things generally comprehend within the police power.

Illustrative of unreasonable restraint upon personal liberty, an ordinance which prohibited anyone knowingly to associate with persons having the reputation of being thieves, burglars, pickpockets, pigeon droppers, bawds, etc. or any other person, for the purpose or with the intent to agree, conspire, combine or confederate, first, to commit any offense, or second, to cheat or defraud any person of any money or property, etc., was held unconstitutional. It was said to be as unjust and unreasonable for a legislative body to undertake to forbid certain associations as to command with whom one should associate; and that without some overt act done, it is beyond the power of human agency to discern and determine with what intent or purpose the human heart is actuated. *Ex parte Smith,* 135 Mo. 223, 58 Am. St. Rep. 576, note 580. In *People v. Turner,* 55 Ill. 280, a statute was declared unconstitutional which authorized the commitment to the reform school of children between the ages of six and sixteen years, "who are destitute of proper parental care and growing up in mendicancy, ignorance, idleness and vice," but who may have committed no crime. This case was distinguished or not followed in Wisconsin, in construing a similar statute, in *The Milwaukee Industrial School* v. *The Supervisors of Milwaukee County,* 40 Wis. 328. In Ruling Case Law it is laid down as the law of the land that liberty as used in the Constitution is not dwarfed into mere freedom from physical restraint of the person of the citizen, but is deemed to embrace the right of a man to be free in the employment of the facilities with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. It includes the right to be free to use his faculties in all lawful ways; to live and work where he will. 6 R. C. L. pp. 259, 260, §244. In *Bailey* v. *Alabama,* 219 U. S. 219, the federal anti-peonage acts, founded on the Thirteenth Amendment, inhibiting involuntary servitude, were held to be violated by a statute which sought to compel service of labor by

making it a crime to fail or refuse to perform it. It was said in that case that although the court might not impute to a state an actual motive to oppress by a statute, yet it should consider the material operation of such a statute and strike it down if it becomes an instrument of coercion forbidden by the Federal Constitution. That decision involved an act of the legislature which made it prima facie evidence of an intent to defraud, forbidden by the statute, for anyone obtaining money from his employer to refuse without cause to perform the labor provided for in the contract, without return of the money; but the principle involved, we think, has application to the statute involved here, in so far as it imposes an unjust and unreasonable restraint on personal liberty.

Our conclusion is that the petitioner is entitled to be discharged from custody, and it is so ordered.

*Petitioner discharged.*