Cheryl WALKER, and James E.
Walker

v.

G. M. POINTER and F. R. Branscome.

Civ. A. No. 3–2929–B.

United States District Court
N. D. Texas,
Dallas Division.

Sept. 18, 1969.

Grover Hartt, Jr., Andress, Woodgate & Hartt, Dallas, Tex., for plaintiffs.

Lawrence R. Maxwell, Jr., Dallas, Tex., for defendants.

## OPINION

HUGHES, District Judge.

This case involves the scope of 42 U.S.C. section 1982 which provides that:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Plaintiffs, Cheryl Walker and her brother, James E. Walker, filed a complaint in this court on December 26, 1968, alleging that on October 7, 1968 they rented an apartment from defendant, G. M. Pointer and signed a one year lease. The apartment was in a complex of several buildings at 14230 Heritage Circle in the City of Farmers Branch in Dallas County, Texas. Defendant F. R. Branscome was the manager. The lease provided for rental payments to be made on the first and fifteenth of each month. At the time of the lease Cheryl Walker was 20 years old and James Walker was 19. About noon on Saturday, December 14, 1968, a written notice[1] signed by F. R. Branscome was delivered to James Walker in the apartment stating that suit would be filed in the Justice Court to evict them unless he and his sister surrendered possession of the apartment by 4:00 o'clock of that day.

Plaintiffs further alleged that on December 16, 1968, at about 1:30 P.M. when neither of the plaintiffs were present, Branscome entered the apartment with three employees, who put their clothes and possessions in boxes and sheets and hauled them away in a truck. These facts are admitted by defendants.

Plaintiffs and defendants belong to the white race. At the time of this occurrence Cheryl Walker was employed in a racially integrated business and James was a student at North Texas State University, a predominantly white institution, attended also by a number of Negro students. Both had black friends who visited in the apartment on several occasions. It is the contention of plaintiffs that they were evicted because they had Negro guests and that such eviction was a violation of 42 U.S.C. § 1982.

The defendants deny that the Walkers were evicted because they entertained blacks as guests. The contention of defendants is that the eviction was caused by the failure of the Walkers to pay the rent on time and by complaints from tenants of noise and disturbance in the apartment.

The first question to be decided is whether this Court has jurisdiction. The answer to the question centers on the perplexing and for this case crucial language of 42 U.S.C. § 1982. After a careful consideration of the facts and the law it is the opinion of this Court that section 1982 covers the situation alleged by plaintiffs and that jurisdiction attaches.

There are few cases construing section 1982, but one case, Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), is of major importance in discussing the statute. In that case plaintiffs alleged that defendants had refused to sell them a home for the sole reason one of the plaintiffs was a Negro. The Supreme Court held that section 1982 applies to all discriminations against Negroes whether from private or public sources in the sale or rental of property. There is no doubt that if the plaintiffs in this case had been Negroes, the statute would apply. The

---

1. The notice was addressed to both plaintiffs and read: "Under the lease you signed with the Heritage Apartment Company, dated October 9, 1968, we can demand that you vacate the apartment at any time. We are exercising this right and demanding that you vacate apartment #206 by 4:00 p. m. on December 14, 1968 or charges will be filed in the Justice of the Peace Court for possession of our apartment."

fact that they are white distinguishes this case and makes it in part one of first impression.

Section 1982 in its original form was part of section 1 of the Civil Rights Act of 1866.[2] The history of this Act, as outlined in *Jones*, reveals that it was passed to implement the Thirteenth Amendment which provides as follows:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

The discussion of the Court in *Jones* indicates that the institution of slavery prompting the Thirteenth Amendment was ordinarily associated with the black man. Yet whites too have historically been susceptible to enslavement in many countries throughout the centuries. In this country white slavery was known to exist during the antebellum period in the South.[3] Current statutes punishing practices relating to slavery continually refer to the victimization of "any person." 18 U.S.C. §§ 1581–1588. The bar against involuntary servitude has been invoked by the courts in numerous contexts where race is immaterial.[4]

The first six words of section 1982 appear to lead inescapably to the conclusion that the statute contemplates a reach as broad as the amendment upon which it is based. "All citizens of the United States" are to be protected. The inclusiveness of these words is reinforced by the *Jones* opinion which states that the rights granted in 1982 are granted "to all citizens without regard to race or color." (420, 88 S.Ct. 2193). *Jones* in a note refers to the following language in the Act of 1870: "the act to protect all

persons * * * in their civil rights. * * * is hereby reenacted * * *." (436, 88 S.Ct. 2201). Hence it is clear that the language of the statute indicates its availability to white plaintiffs as part of a greater class of "all citizens."

In this case, according to plaintiffs' allegations, they are direct victims of black racial discrimination, discrimination directed at them because of their black associations. Since this discrimination has disturbed their leasehold, they should be as entitled to relief under section 1982 as if their skin was black.

There is much to recommend this particular application of 1982 to the instant case. *First*, it is not at odds with the law that does exist under 1982 and the Thirteenth Amendment. *Second*, it is supported by analogous cases under the Fourteenth Amendment. *Third*, to limit the availability of relief from black discrimination only to those whose skin is black would be to give the statute a racist construction incompatible with the due process clause of the Fifth Amendment.

As observed earlier in this opinion, rudimentary application of the Thirteenth Amendment freedom from involuntary servitude was not extended on a basis of racial qualification but rather was responsive to whether any individual suffered from the wrong the amendment was created to cure. Making relief available to the white victim of discrimination against black people adheres to this earlier, established Thirteenth Amendment principle.

There is much in the language of *Jones* which would support protection of real property and personalty interests of any persons subjected to racial discrimination, whether on the basis of the color of their skin or the color of the skin of those with whom they choose to associate. The

2. Act Apr. 9, 1866, c. 31, § 1, 14 Stat. 27.

3. K. Stamp, The Peculiar Institution, 207–09 (1956).

4. Peonage: Clyatt v. United States, 197 U.S. 207, 218, 25 S.Ct. 429, 49 L.Ed. 726 (1904), coercion through state antifraud statute: Bailey v. Alabama, 219

U.S. 219, 240–241, 31 S.Ct. 145, 55 L.Ed. 191 (1910), wrongful conviction: United States v. Morgan, 222 F.2d 673 (2d Cir. 1955), coercion of seaman; In re Chung Fat, 96 F. 202 (1899), vagrancy: Ex parte Hudgins, 86 W.Va. 526, 103 S.E. 327, 9 A.L.R. 1361 (1920).

following statements seem particularly significant on this point. "We hold that § 1982 bars *all*[5] racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment." (413, 88 S.Ct. 2189). "§ 1982 grants to all citizens, without regard to race or color, 'the same right' to purchase and lease property 'as is enjoyed by white citizens.'" (420, 88 S.Ct. 2193). "[I]f § 1982 'means what it says' * * * then it must encompass every racially motivated refusal to sell or rent and cannot be confined to officially sanctioned segregation in housing." (421–422, 88 S.Ct. 2194). "[W]hen Congress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private". (423–424, 88 S.Ct. 2195). According to Senator Trumbull, "the bill would 'break down *all* discrimination between black men and white men.'" (432, 88 S.Ct. 2199, emphasis in original). "It thus appears that, when the House passed the Civil Rights Act on March 13, 1866, it did so on the same assumption that had prevailed in the Senate: It too believed that it was approving a comprehensive statute forbidding *all* racial discrimination affecting the basic civil rights enumerated in the Act."[6]

Two Fourteenth Amendment cases indicate by analogy that protecting plaintiffs from the effects of racial discrimination against blacks would be rationally and legally supportable. In Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963), four petitioners, including one white student, obtained reversals of their trespass convictions because they were adjudged victims of racial discrimination sufficiently involving state action. Though the court did not speak directly to the relative position of white petitioner, the reversal of *his* conviction can only be explained by a recognition of the court that he was a victim of discrimination against blacks and that he shared a position before the court with the blacks as one entitled to the same remedy.

Even stronger by analogy is the Third Circuit opinion, Valle v. Stengel, 176 F.2d 697 (1949). This case dealt with 42 U.S.C. § 1981. The statute states, "in terms that closely parallel those of § 1982",[7] that all persons in the United States "shall have the same right * * to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens * * *.'" The following language from Valle v. Stengel indicates that with a statute similar to the one in the instant case the characer of the discrimination involved entitled whites in the company of black persons to relief.

> * * * the plaintiffs were denied equal protection of the laws within the purview of the Fourteenth Amendment because they were Negroes *or acting in association with Negroes* when they attempted to gain admission to the pool at Palisade Park. They, or some of them, were ejected from the park, were assaulted and were imprisoned falsely, as alleged in the complaint, because they were Negroes, *or were in association with Negroes,* and were denied the right to make or enforce contracts, all within the purview of and prohibited by the provisions of [1981].[8]

It would not have been difficult for the Supreme Court in *Lombard* or the Court of Appeals in *Valle* to have denied relief to the white plaintiffs and their refusal

---

5. Emphasis in original.

6. 392 U.S. at 435, 88 S.Ct. at 2200, emphasis in original.

7. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 442 n. 78, 88 S.Ct. 2186, 2204, 20 L.Ed.2d 1189 (1968).

8. 176 F.2d at 702 (emphasis added).

to do so appears to suggest a right which would also exist (though under a different amendment) for plaintiffs here.

To deny jurisdiction under section 1982 to plaintiffs would be to hold in effect that only those suffering from discrimination against black people who happen to be black come within the protection of the statute. This would surely be to read in 1982 a racist purpose. The jurisdictional basis of the statute so read would be antithetical to the ennobling objective of the statute and of the Thirteenth Amendment from which it was drawn. Further, such a reading would cast doubt on the constitutional validity of 1982. "[D]iscrimination may be so unjustifiable as to be violative of due process. \* \* \* Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." [9]

■ It is the conclusion of this Court that the plaintiffs are within the jurisdictional scope of section 1982 in their own right—even though they are not Negro persons and irrespective of whatever harm might have befallen Negro persons as a result of the alleged interruption of the Walker leasehold by defendants.

There is, in addition, a second ground which supports jurisdiction for the plaintiffs. This ground is formed when Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), and its progeny are read with the decision of the Supreme Court in *Jones*. This second jurisdictional basis differs from the first in that the constitutional focus shifts to the question: what constitutional rights have Negro persons been deprived of as a result of defendant's alleged acts?

In Barrows v. Jackson, *supra*, plaintiffs were parties to a racial covenant and sought damages against another party to the covenant who had conveyed his property to a Negro person. The State Supreme Court of California denied relief and the United States Supreme Court affirmed, citing Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947). In *Shelley* the Court had held that a private racial covenant could not be enforced against a Negro purchaser in state court because the part played by the state court in enforcement lent sufficient state action to the discrimination to render it violative of the equal protection clause of the Fourteenth Amendment.

While in *Shelley* the Negroes whose constitutional rights were endangered were parties in the case, in *Barrows* the Negroes to be protected were neither parties nor even identified. The concern of the *Barrows* Court was that the financial penalization of whites breaching restrictive covenants to sell to non-caucasians might produce, to borrow a contemporary term, a "chilling effect" [10] on the attitudes of subsequent white vendors.

If a state court awards damages for breach of a restrictive covenant, a prospective seller of restricted land will either refuse to sell to non-Caucasians or else will require non-Caucasians to pay a higher price to meet the damages which the seller may incur. Solely because of their race, non-Caucasians will be unable to purchase, own, and enjoy property on the same terms as Caucasians. Denial of this right by state action deprives such non-Caucasians, unidentified but identifiable, of equal protection of the laws in violation of the Fourteenth Amendment.[11]

Noting the absence of non-Caucasians as parties in the suit the Court asked,

May respondent, whom petitioners seek to coerce by an action to pay damages for her failure to honor her restrictive covenant, rely on the invasion of the

---

9. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); cf. Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917).

10. Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

11. 346 U.S. at 254, 73 S.Ct. at 1034. *See also*, Buchanan v. Warley, *supra*, note 9.

rights of others in her defense to this action? [12]

The question was answered in the affirmative. In granting protection to respondent the Supreme Court in *Barrows* departed from the rule that one cannot raise a constitutional objection "unless he can show that he is within the class whose constitutional rights are allegedly infringed." [13]

> Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained.[14]

The jurisdictional prerequisites set forth in *Barrows* have been satisfied in the instant case. It has been alleged in paragraphs five and six of the Walker complaint that plaintiffs suffered substantial harm because they made the property under their lease available to black social guests. The Walkers did not plead that they were entitled to relief because Negro persons were denied the opportunity to acquire certain privileges amounting to lesser but cognizable property interests through defendants' acts. They did not plead that the failure to provide a remedy for racially motivated interruption of leaseholds would seriously diminish the willingness of whites in general to entertain Negro guests. There was, however, sufficient evidence to bring both of these factual issues before the Court. "F.R.Civ.P. 54(c) * * lays down the standard that except for default decrees the form of relief and the nature of the order to be entered is to be determined by what the facts establish, not what the lawyer prays for." [15]

To be sure, the fact that *Barrows* arose under the Fourteenth Amendment affects its application by analogy to these facts. While the Fourteenth Amendment can be used to protect the Negro, among others, in a variety of civil contexts, interests of the Negro protected under the Thirteenth Amendment are largely restricted to the language of 42 U.S.C.A. § 1982. On the other hand, while relief was granted in *Barrows* because requisite state action was found, only private action need be found in the instant case.[16]

Section 1982 establishes for Negro persons, *inter alia*, the right to "hold * * * real and personal property". It is alleged that defendants evicted the Walkers in retaliation for the appearance of Negro guests on or about the Walker premises and in order to prevent a recurrence of such visits in the future. In light of the decision of the Supreme Court in *Jones* it is reasonable to characterize the freedom of Negro persons to come and go at the invitation of one lawfully in control of the premises as sufficiently pertaining to a condition of property to be a right to "hold" under section 1982. In *Jones* the Court cites with approval of the "great fundamental rights" sought to be preserved by the Civil Rights Act of 1866:

> the right to acquire property, the right to go and come at pleasure, the right to enforce rights in the courts, to make

12. 346 U.S. at 254–255, 73 S.Ct. at 1034.

13. Id. at 256, 73 S.Ct. at 1035, citations omitted.

14. Id. at 257, 73 S.Ct. at 1035. This rule within a rule was discussed in N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), where the Supreme Court stated that it was applicable where "constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court." (459, 78 S.Ct. at 1170). *See also*, Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

15. South Falls Corp. v. Rochelle, 329 F. 2d 611, 619 (5th Cir. 1964); Molnar v. Gulfcoast Transit Co., 371 F.2d 639, 640–641 (5th Cir. 1967); Duke v. Sun Oil Co., 320 F.2d 853 (5th Cir. 1963).

16. Jones v. Alfred H. Mayer, *supra*, note 7, at 423–424, 88 S.Ct. 2186.

contracts, and to inherit and dispose of property.[17]

Naturally freedom to "go and come at pleasure" is not to be asserted as a right under section 1982 regardless of the circumstances. Yet the force of language quoted in *Jones* seems to say at least that the freedom of a Negro person to occupy a given dwelling at his pleasure and at the pleasure of one lawfully in control of the premises should not be abridged by a third party because of the color of the Negro person's skin.

Further, the harm to Negro persons from the facts alleged is demonstrable through an examination of the tangible property interests which Negroes would have had an opportunity to possess but for the racially motivated destruction of the Walker leasehold by defendants. While these interests are lesser in magnitude than power to lease or own the property, they are property interests nonetheless—interests Negro persons are entitled to receive and hold under section 1982.

First, Negro invitees along with all other social and business guests would have been able to enjoy an implied easement of ingress and egress over the common area controlled by defendants immediately adjacent to the Walker leasehold.[18] This right is not merely in the host on behalf of the invitee but in the invitee himself.[19] The availability of this interest to future Negro guests of the Walkers was destroyed along with the leasehold.

Second, Negro guests of the Walkers would have had an opportunity to receive possessory interests in the property amounting to licenses. To create a license the Walkers need only grant to their guests authority to do some act on the premises.[20] The creation of a license would occur easily in a social context since it neither requires consideration [21] nor comes under the Statute of Frauds.[22]

Since the breadth of section 1982 is sufficient to encompass *all* cognizable property interests, "real and personal", it is perforce broad enough to protect prospective black visitors to the Walker apartment from a racially motivated disability to receive and hold such interests. It is broad enough to protect "unidentified but identifiable" [23] Negro persons from the chilling effect of such action gone unremedied on the attitudes of other non-Negro hosts.

Since it is determined that this Court has jurisdiction, the merits will next be considered.

Defendants contend that plaintiffs were evicted for failure to pay the rent on time and because of noise and boisterous conduct in the apartment. The evidence fails to sustain these contentions. Rental records introduced by defendants showed six different dates on which the Walkers paid rent. While the rent was paid two to four days late, the records also showed many other tenants paying rent on the same day both before and after the Walkers' payments were received. On some occasions there were as many as twenty five payments made in addition to the payments made by the Walkers. Branscome made no complaint to the Walkers about their payments being late and there is no evidence that any other tenants who paid their rent late were evicted as the Walkers were.

With reference to the contention that there was loud noise in the apartment the

17. Id. at 432, 88 S.Ct. at 2199.

18. Lott v. State, 159 Miss. 484, 132 So. 336 (1931); Anthony v. Chicopee Manufacturing Co. of Georgia, 168 Ga. 400, 147 S.E. 887 (1929).

19. Anthony v. Chicopee Manufacturing Co. of Georgia, *supra* note 18; Commonwealth v. Burford, 225 Pa. 93, 73 A. 1064 (1909).

20. See, generally, Settegast v. Foley Bros. Dry Goods Co., 114 Tex. 452, 270 S.W. 1014 (Comm'n.App.1925).

21. Davis v. Clark, 271 S.W. 190 (Tex.Civ. App.1925), dismissed.

22. Chicago, R. I. & G. Ry. Co. v. Johnson, 156 S.W. 253 (Tex.Civ.App.1913), error ref.

23. Barrows v. Jackson, 346 U.S. 249, 254, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

defendant called three witnesses who testified to loud music and talking, but who made no complaint to the Walkers or to the management of the apartment. The plaintiffs offered credible testimony that they had had two parties during the time they were in the apartment, both orderly and without undue noise.

On the other hand there is ample credible evidence sustaining plaintiffs' allegations that they were evicted because they had Negro guests. The testimony reveals that the policy of the apartment management was one of discrimination against Negroes. Two former assistant managers testified that they had been told by Branscome to tell persons who phoned about vacancies to say there was one apartment vacant. Upon arrival at the office if the caller was a Negro, he was told the apartment had been rented. Fictitious leases with fictitious deposit checks attached were available to show the prospective renter. The assistant manager in a complex in the Oak Lawn section of Dallas, also owned by Pointer and managed by Branscome, was told that Negroes were about to invade Oak Lawn and that she should always have a fictitious lease available. Assistant managers were likewise instructed to watch for Negro guests in the apartments and to report to the manager if any were seen. A tenant in the same complex with plaintiffs testified that after a Negro friend of her son's had been a guest for dinner she was warned that the management did not approve of such guests and she would not be permitted to have any.

When Cheryl Walker learned of the notice to move she consulted an attorney, Cecil Woodgate, who telephoned Branscome for an explanation. Mr. Woodgate was informed that the management did not want James there because he was the hippy type and brought Negroes to the apartment. The testimony of Branscome to the effect that plaintiffs were not evicted because they had Negro guests is not credible, much of his testimony being contradicted by believable witnesses. Luanda Mayberry, former secretary to defendant Branscome, testified that on the morning of December 14 she reported to Branscome that James Walker and a young Negro boy had been pushing the Walker car on premises adjacent to the Walker apartment, whereupon Branscome dictated the aforementioned letter of eviction.

The evidence thus establishes that the reason for the eviction and the termination of the lease was a policy of racial discrimination implemented by Branscome. The racially motivated termination of the lease violated section 1982 which expressly protects the right to "lease" real property. The evidence shows that as a result of this violation the Walkers suffered damages. Their clothing and other possessions were retained for almost three months and some were never returned. Others were returned in damaged condition. Branscome was employed by Pointer to manage the apartments. Pointer testified that Branscome had authority to ask tenants to move. Hence he as well as Branscome is liable for actual damages resulting from the eviction.

With regard to the claim for exemplary damages there is abundant evidence that Branscome acted with malice. There is credible testimony that on the day of eviction, Monday, December 16th, Branscome had James' car, which was legally parked next to the apartment building, backed into a lane and pushed 300 yards to a thoroughfare where it was left on the highway six feet from its edge. While James went after the car, Branscome with 3 employees entered the apartment with boxes, dumped all their clothes and food from the refrigerator into boxes and sheets from the bed and carried them away in a truck without advising either James or Cheryl, who had arrived while the eviction was taking place, where their belongings were to be taken. When James attempted to use the telephone, Branscome pulled the telephone out of the wall and threw it at James. When plaintiffs asked to be allowed to spend the night, Branscome said they could stay without heat and pulled the

thermostat from the wall. Branscome had taken no action in the Justice Court to evict plaintiffs as he had said he would do in his notice of December 14th. The malice with which Branscome acted entitles plaintiffs to exemplary damages.

■ With reference to the claim for exemplary damages against Pointer, the Texas and federal rule is:

"a principal is not liable in exemplary damages on account of the acts of his agent unless such acts were authorized by the principal or subsequently ratified or approved with knowledge of the facts."[24]

■ While Branscome had been authorized to evict tenants, there is no evidence that he was authorized to evict in the manner used in the case of plaintiffs, nor is there evidence that after the eviction Pointer knew of the facts surrounding the eviction and ratified or approved them. Recovery of exemplary damages is therefore denied against Pointer.

Judgment has been entered in accordance with this opinion.

24. Wilson v. Nand Singh, 42 S.W.2d 803, 804 (Tex.Civ.App.1931). *See also* Yarbrough v. Brookins, 294 S.W. 900 (Tex. Civ.App.1927), error dismissed. Mitchell v. Union Pacific Railroad Co., 188 F. Supp. 869 (S.D.Cal.1960).