Mrs. Margaret Faye **TERRY** et al., Plaintiffs,

v.

The **ELMWOOD CEMETERY**, Defendant.

Civ. A. No. 69–490.

United States District Court

N. D. Alabama, S. D.

Dec. 22, 1969.

James K. Baker, Adams, Baker & Clemon, Birmingham, Ala., and Jack Greenberg, Norman C. Amaker and James Nabrit, III, New York City, for plaintiffs.

Sydney Lavender, Deramus, Johnston, Barton, Proctor & Swedlaw, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

LYNNE, Chief Judge.

This class action for damages, injunctive and/or declaratory relief was brought by Negro plaintiffs, Mrs. Margaret Faye Terry, Mrs. Jimmie Lee Terry and Mr. Blevin Stout, who were not allowed to purchase burial lots in the public cemetery[1] owned and operated by defendant, The Elmwood Cemetery Corporation. The facts are not disputed and consequently the action has been submitted to the court for a judgment on the pleadings[2] pursuant to Federal Rules of Civil Procedure 12(c).

Bill Henry Terry, Jr., a Negro citizen of the United States and of the State of Alabama, volunteered to serve his country as a soldier on September 22, 1968, was sent to Fort Gordon, then to Japan, and arrived in Viet Nam on March 8, 1969. Having a premonition that he might be killed while in Viet Nam, he told his mother and young wife, two of the plaintiffs in this action, that he wished to be buried in Elmwood Cemetery in Birmingham, Alabama, in the event of his death. On July 3, 1969, Bill Terry was mortally wounded by the enemy while he was participating in a search and destroy mission. His body was sent back to the United States with the customary military escort, and upon arrival in Alabama was taken by the military authorities, in the company of the plaintiff mother and the plaintiff wife, to the Elmwood Cemetery, where the two mentioned plaintiffs attempted to purchase a burial plot. A man who identified himself as the manager of

Elmwood refused to sell a cemetery lot for interment of Bill Terry's remains to these plaintiffs solely because they were Negroes.[3] Elmwood has attempted to justify this action by answering that it has a policy of refusing burial in its cemetery to persons other than Caucasians which is based on the fact that all lot deeds for grave sites at the cemetery contain a provision limiting interment in Elmwood Cemetery to members of the Caucasian race, and that rules and regulations promulgated by Elmwood in 1954 provide in part:

> Cemetery lots shall be owned only by human beings of the white and/or Caucasian race and the said lots shall be used only for burial of human bodies of the white and/or Caucasian race, and such ownership and use shall at all times be subject to the Rules and Regulations and By-Laws of Elmwood now or hereafter in force. Any attempted transfer of a lot or interest in a lot to one not authorized to own same shall be invalid and of no force and effect and the corporation shall not be obligated to honor such transfer.[4]

Since Bill Terry's wife and mother had already arranged for a funeral, when they were refused the right to purchase a burial lot from Elmwood, they had no alternative on July 19, 1969, but to have his body interred in a Negro cemetery.

On July 25, 1969, the wife and mother of Bill Terry, along with Belvin Stout, a Negro citizen of the United States who resides in Hueytown, Alabama, who also was not allowed to purchase a grave site from Elmwood because he was a Negro, filed this suit, alleging, *inter alia*, unlawful discrimination against Negroes as a class by Elmwood, which discrimination constitutes a badge or incident of

---

1. "The law contemplates two classes of cemeteries, public and private. The former class is used by the general community or neighborhood or church, while the latter is used only by a family or a small portion of a community. * * * The test is public user." Smith and Gaston Funeral Directors, Inc. v. Dean, 262 Ala. 600, 80 So.2d 227, 234 (1955) (quoting

from another case). Under this test, Elmwood Cemetery is a public cemetery.

2. The pleadings consist of the Complaint and the Answer.

3. These facts have been taken almost verbatim from the Complaint at 3–4.

4. Answer at 1–2.

slavery contrary to the thirteenth amendment of the Constitution of the United States and the 1866 Civil Rights Act, 42 U.S.C. § 1982 (1964). Jurisdiction of the court was invoked pursuant to 28 U.S.C. §§ 1343(3) & (4), 2201 (1964).

The Terry plaintiffs have offered to exhume the remains of Bill Henry Terry, Jr., and to transfer them to the Elmwood Cemetery if the court declares that the defendant wrongfully abridged plaintiffs' rights in refusing to sell them lots in the cemetery solely because they were Negroes.

Elmwood, through its attorneys, has indicated that it will comply with any declaration of rights the court shall make in this matter, and therefore the court will simply declare the rights of the parties, as authorized by 28 U.S.C. § 2201 (1964), and shall decline to issue an injunction at this time.

■ It is the opinion of the court that the 1866 Civil Rights Act, now embodied in 42 U.S.C. § 1982 (1964), requires that Negroes and other non-Caucasians be extended the same rights to purchase cemetery lots as whites are given. That Act provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

Prior to June 17, 1968, it had long been assumed that this Act did not proscribe private discrimination, but was enacted by Congress under the authority of the fourteenth amendment of the United States Constitution, and thereby was circumscribed by the "state action" limitations of that amendment.[5] At least one of the reasons for this erroneous assumption was the tortured legislative history of the 1866 Civil Rights Act. It was enacted by an angry and punitive Congress, over the veto of President Andrew Johnson, shortly after the close of the War Between the States. Because many legislators at the time were of the opinion that it was perhaps unconstitutional, after the fourteenth amendment was ratified in 1868, the 1866 Civil Rights Act was reenacted in 1870.[6] Because of its restricted interpretation, it was seldom invoked by the courts.[7]

However, in June, 1968, the Supreme Court of the United States in the landmark case of *Jones v. Alfred H. Mayer Co.*,[8] resurrected this statute from the catacombs of desuetude, and held that:

§ 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment.[9]

The defendant has vigorously contended that interests in cemetery lots fall without the scope of § 1982. The court is not persuaded. Basically, there are two strings to defendant's bow: (1) § 1982 can only be supported by the thirteenth amendment if the section is considered a fair housing law, and *Jones* should therefore be limited to its precise facts; (2) the rights of a purchaser of a cemetery lot, because of its unique nature, do not fall within the meaning of the phrase "real and personal property" as used in § 1982. The first aspect of the argument may be disposed of quickly,

---

5. See 8 Washburn L.J. 268 (1969).

6. See Comment, Civil Rights: Housing Discrimination—Revival of Civil Rights Act of 1866, 53 Minn.L.Rev. 641 (1969).

7. A commentator has capsuled the history of the 1866 Act as follows:
   Like the English artist Aubrey Beardsley, the 1866 Civil Rights Act enjoyed early recognition, suffered thereafter a long period of obscurity, and was discovered anew by a later generation.
   Kohl, The Civil Rights Act of 1866, Its Hour Come Round at Last: Jones v. Alfred H. Mayer Co., 55 Va.L.Rev. 272 (1969).

8. 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed. 2d 1189 (1968).

9. Id at 413, 88 S.Ct. at 2189 (emphasis by the Court).

but the second point requires more detailed consideration.

Since the famous case of *Marbury v. Madison*,[10] the doctrine of judicial review by the federal courts has been firmly established, and pronouncements by the United States Supreme Court concerning the scope of constitutional provisions and the breadth and validity of statutes are considered the law of the land, binding on this and all other federal and state courts.[11] It is true that the facts in *Jones* involved the refusal of the defendants to sell the plaintiffs in that case a home in a Missouri community solely because the plaintiffs were Negroes. However, the statements concerning the scope of § 1982 were broad, and the effect of the decision was to reactivate a statute which had fallen into disuse. Nowhere did the Court indicate that § 1982 could only be sustained under the thirteenth amendment if construed as a fair housing law. To the contrary, its "badge of slavery" rationale indicates that it considers that § 1982 is valid and applicable in any situation involving racial barriers to the acquisition of real and personal property. In holding that the thirteenth amendment authorized § 1982, the Court stated:

> Thus, the fact that § 1982 operates upon the unofficial acts of private individuals, whether or not sanctioned by state law, presents no constitutional problem. If Congress has power under the Thirteenth Amendment to eradicate conditions that prevent Negroes from buying and renting property because of their race or color, then no federal statute calculated to achieve that objective can be thought to exceed the constitutional power of Congress simply because it reaches beyond state action to regulate the conduct of private individuals. The constitutional question in this case, therefore, comes to this: *Does the authority of Congress to enforce the Thirteenth Amendment "by appropriate legislation" include the power to eliminate all racial barriers to the acquisition of real and personal property? We think the answer to that question is plainly yes.*

> "By its own unaided force and effect," the Thirteenth Amendment "abolished slavery, and established universal freedom." * * * Whether or not the Amendment *itself* did any more than that—a question not involved in this case—it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more. For that clause clothed "Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.*"[12]

Cases subsequent to *Jones* construing § 1982 conclusively demonstrate that this court is on sound constitutional ground in recognizing the broad construction of the reactivated statute. Several recent cases have emphasized the broad language in *Jones*,[13] three of them holding that whites as well as Negroes are protected by § 1982,[14] and another construing the section to protect Negroes from exploitation by white real estate

---

10. 5 U.S. (1 Cranch) 137, 2 L.Ed.2d 60 (1803).

11. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

12. 392 U.S. at 438–439, 88 S.Ct. at 2202 (emphasis in first paragraph added, emphasis in second paragraph by the Court).

13. See Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969); Gannon v. Action, 303 F.Supp. 1240 (E.D.Mo.1969); Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894 (E.D.Mo.1969); Contract Buyer's League v. F & F Investment, 300 F.Supp. 210 (N.D.Ill. 1969); Bush v. Kaim, 297 F.Supp. 151 (N.D.Ohio 1969).

14. See Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969); Gannon v. Action, 303 F.Supp. 1240 (E.D.Mo.1969); Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894 (E.D.Mo. 1969).

entrepreneurs.[15] In addition, since *Jones,* courts have awarded damages, both actual [16] and exemplary,[17] and attorneys' fees,[18] to parties whose rights under § 1982 have been violated, in spite of the fact that the statute does not mention the availability of these remedies. Finally, the Supreme Court itself, on December 15, 1969, focused upon § 1982 to hold that Negroes may not be barred from acquiring membership shares in and thereby becoming members of community recreational organizations.[19]

Considering these authorities, this court, while recognizing that *Jones* has been strongly criticized by some commentators [20] and was perhaps an exercise in judicial activism, is of the opinion that its real effect is to reactivate § 1982 generally. It therefore becomes the duty of this court to determine whether a cemetery lot is "property" within the meaning of the 1866 Civil Rights Act, 42 U.S.C. § 1982 (1964).[21]

In any case, the concept of "property" is an elusive one. Property law is re-

plete with semantic problems. It is possible for the same court in the same jurisdiction within the span of a few years to give the same general type of interest in property several different labels.[22] Frequently too, the narrow line between contract rights and property rights is vague.[23] The problems inherent in the area are compounded when interests in land are incorporeal in nature. However, if a functional rather than a conceptual approach is used toward property law and interests in land, it is clear that a purchaser's interest in a burial lot is a "property right" whether it be called an easement, license, right of sepulture or whatnot. Tiffany has stated:

> The privilege of interring bodies in a burial ground belonging to a corporation or association has been referred to as an easement, as a usufructuary right, and as a license. However characterized, the lot holder, as he is frequently termed, even if not owner of the fee, has an interest in the lot which is such a property right as the law recognizes and protects from invasion.[24]

15. See Contract Buyer's League v. F & F Investment, 300 F.Supp. 210 (N.D.Ill. 1969).

16. See Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969); Pina v. Homsi, 1 Race Rel.L.Survey 183 (D.Mass.1969); Newbern v. Lake Lorelei, Inc., 1 Race Rel. L.Survey 185 (S.D.Ohio 1969).

17. See Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969); Newbern v. Lake Lorelei, Inc., 1 Race Rel.L.Survey 185 (S.D. Ohio 1969).

18. See Pina v. Homsi, 1 Race Rel.L.Survey 183 (D.Mass.1969); Newbern v. Lake Lorelei, Inc., 1 Race Rel.L.Survey 185 (S.D.Ohio 1969).

19. See Sullivan v. Little Hunting Park, Inc., 90 S.Ct. 400 (Dec. 15, 1969). The *Sullivan* decision was handed down after the instant opinion had been prepared, and consequently it is not fully discussed herein. However, *Sullivan's* thrust reaffirms this court's construction of § 1982.

20. See, e. g., 1968 Sup.Ct.Rev. 89; Thagard, The Making of a Civil Rights Case: Jones v. Alfred H. Mayer Company, 30 Ala.Law 438 (1969).

21. In this respect, the instant case appears to be one of first impression.

22. For instance, in the field of property law concerning real covenants in restraint of trade, which may or may not run with the land, a promise in a deed not to build a store upon a certain parcel of land might be called an "easement," a "covenant," an "equitable servitude," an "equity," or an "amenity," depending upon whether the action is equitable or legal in nature, and the particular result the court would like to reach. See C. Clark, Real Covenants and Other Interests Which "Run With Land" 5 (2d ed. 1947); Comment, Real Covenants in Restraint of Trade—When Do They Run with the Land?, 20 Ala.L. Rev. 114 (1967).

23. See Comment, Real Covenants in Restraint of Trade—When Do They Run with the Land?, supra note 22, at 117. See also, Spencer v. Flint Memorial Park Ass'n, 4 Mich.App. 157, 144 N.W.2d 622 (1966).

24. 3 H. Tiffany, The Law of Real Property § 774 (3d ed. 1939). See also 2 R. Powell, The Law of Real Property ¶ 262 (Recomp.1967).

In the final analysis, a "property right" of any nature may be defined as "that type of relationship which is entitled to protection from a decision maker."[25]

Tested against this standard, it may be conclusively established that interests in cemetery lots are property rights. It has been held in Alabama, and this is evidently in accord with the common law in many states, that owners of cemetery lots may maintain actions of trespass against persons who wrongfully interfere with their grave sites,[26] that title to a cemetery lot may be obtained by prescription or adverse possession,[27] and that actions equitable in nature may be maintained by a lot owner's heirs to prevent interference with a dedicated alleyway adjacent to the burial plot.[28] Moreover, cemetery lots may be specifically devised or pass by intestate succession.[29] In addition, the Alabama Legislature has recognized that a cemetery lot is some type of property interest, because it has exempted cemetery lots from "levy and sale, under execution or other process."[30]

The conclusion that the owners of burial rights have a property interest in their lots is further supported by a recent Michigan case, *Spencer v. Flint Memorial Park Ass'n*,[31] which held that it is a denial of equal protection of the law in contravention of the fourteenth amendment "for a state to enforce a restrictive agreement of a cemetery association which would deny the owner of a cemetery plot, who is a Negro, the right to bury a non-Caucasian therein."[32] The Michigan court recognized the semantic problems in this area, but concluded that an interest in a cemetery lot is a property right:

> As pointed out by the defendant, the interest of the plaintiff herein is a burial right or right of sepulture. There is no question but that such burial right is a peculiar interest incapable of being pushed into the convenient pigeonhole lawyers and judges are so wont to place difficult concepts. It is not a fee interest, but rather a right of burial which is transferable and the rights of holders thereof are legally enforceable. * * * Regardless of what label we hang on this interest, it is a property right.[33]

To establish that cemetery lot owners do not have "property rights" in cemetery lots, the defendant relies primarily on several general statements from legal encyclopedias,[34] and some observations made by the Alabama Supreme Court in a 1955 case.[35] However, these pronouncements may be explained away by noting that later in the same authorities, statements are made to the effect that burial rights are property inter-

25. H. Cohen, Fundamentals of Land Use Law ix (1962).

26. See Smith and Gaston, Inc. v. Dean, 262 Ala. 600, 80 So.2d 227 (1955); Bessemer Land & Improvement Co. v. Jenkins, 111 Ala. 135, 18 So. 565 (1895); 3 H. Tiffany, supra note 24.

27. See Union Cemetery Co. v. Alexander, 14 Ala.App. 217, 69 So. 251 (1915); Annot., 107 A.L.R. 1294 (1937) ("It seems to be well established that right in a cemetery lot may be acquired by adverse possession just as any other interest in real estate may be acquired * * *").

28. See Weiss v. Taylor, 144 Ala. 440, 39 So. 519 (1905).

29. See Annot., 26 A.L.R.3d 1425 (1969). If a burial lot is not specifically devised, or if the owner thereof dies intestate, the property interest in the lot passes to the owner's heirs at law. Id.

30. Ala.Code tit. 7 § 628 (1958).

31. 4 Mich.App. 157, 144 N.W.2d 622 (1966).

32. 144 N.W.2d at 623.

33. Id. at 628. The *Spencer* case is discussed with approval in Note, Constitutional Law—Racial Restrive Covenant Cannot Be Recognized As a Defense to a Suit for Specific Performance of a Cemetery Burial Contract, 13 Wayne L. Rev. 735 (1967).

34. See 14 Am.Jur.2d Cemeteries § 25, at 732 (1964); 14 C.J.S. Cemeteries § 25, at 84 (1939).

35. See Smith and Gaston Funeral Directors v. Dean, 262 Ala. 600, 80 So.2d 227, 230 (1955).

ests,[36] and by recognizing that the writers of these conclusions were struggling with the semantic problems inherent in the area.

Assuming then, that the owners of cemetery lots, or burial privileges therein, have a "property right" in such lots because their interests will be recognized, protected and effectuated by the courts, it is clear that cemetery lots are "property" within the meaning of § 1982, because the words "real and personal property" as used in the statute exhaust all the possibilities of types of property.[37] This view concerning the scope of § 1982 is supported by the observations of a commentator on the subject:

> A comparison of Section 1982 with the more recent [civil rights] statutes reveals important differences in the types of property transactions which each was designed to protect. On one hand Section 1982 refers to "real and personal property," without further qualification. There can be no question from a reading of the briefs that the parties in *Jones v. Mayer* were keenly aware of the potential expansive interpretation of this term. Since most definitions of property con-

sider real and personal property to exhaust the generic concept of "property," rather than being divisions of a larger class, the words of this statute are seemingly all-inclusive.

This expansive definition of the term accords with the general purpose of Congress in drafting Section 1982. The policy of Section 1982 was to allow the emancipated slaves to participate in the wealth of the nation. There is no reason to assume that Congress meant to limit the scope of these terms as they are generally understood, by carving out any portion of property from Negroes' buying power. It therefore appears that "real and personal property," as used in Section 1982, would include more than just housing, food and clothing * * * [38]

Furthermore, in *Walker v. Pointer*,[39] the Northern District of Texas held that implied easements of ingress and egress, and licenses, are "property" within the scope of § 1982. In that case, white plaintiffs were allowed both actual and exemplary damages, where the manager of an apartment house had evicted them with malice solely because they had entertained Negroes in their apartment.

---

36. In 14 Am.Jur.2d Cemeteries § 25, at 733 (1964), it is stated:

> Even though the purchaser of a cemetery lot may not acquire the fee simple title to the property, he has a property right in his lot which the law recognizes and protects by appropriate remedies from invasion, whether it is by a mere trespasser or by the corporation itself. He acquires the exclusive right to make interments in the lot, and a right to the free and unobstructed use of the alleys and driveways in the cemetery for the purpose of obtaining access to his lot.

And in 14 C.J.S. Cemeteries § 25, at 85, the following observation is made:

> The lot owner's title to the lot is a legal estate, and his interest is a property right entitled to protection from invasion, but only in a restricted sense does it constitute an interest in real property.

In Smith and Gaston Funeral Directors v. Dean, 262 Ala. 600, 80 So.2d 227, 232 (1955), the Alabama Supreme Court,

quoting from another case, made the following statement:

> Ordinarily, the purchaser of a lot in a cemetery acquires only an easement or license to make interments therein exclusive of others. This right of sepulture is a property right, subject to reasonable rules and regulations governing the cemetery and, of course, to be controlled by the state in the exercise of its police powers. When that right is violated, the owner is as certainly entitled to all the remedies which the law affords as if he owned a fee simple.

37. In most modern jurisdictions "all property is divided into two general classes, real and personal, and these terms are commonly used to denote property of all kinds." 73 C.J.S. Property § 4 (1951).

38. Note, Jones v. Mayer: The Thirteenth Amendment and the Federal Anti-Discrimination Laws, 69 Colum.L.Rev. 1019, 1028–29 (1969).

39. 304 F.Supp. 56 (N.D.Tex.1969).

Under this authority, it is clear that cemetery lots, or rights of burial therein, even if considered "easements" or "licenses," are "property" within the meaning of § 1982.

The court is also of the opinion that because of the new interpretation of § 1982, the racial covenants and regulations of Elmwood restricting burial in its cemetery to Caucasians are void and of no legal effect, because now, under *Jones,* even private discrimination is unlawful in the sale or purchase of real or personal property. The court is, of course, aware of the decisions in *Shelley v. Kraemer* [40] and *Hurd v. Hodge,*[41] and their progeny, which held in effect that neither state courts nor the federal courts in the District of Columbia could enforce racial restrictive covenants without contravention of the equal protection clause of the fourteenth amendment or the public policy of the United States. It was generally assumed under these decisions that private discrimination was still constitutionally allowable, even though under expanded concepts of "state action" and other judicial techniques, courts more and more reached out to strike down discriminatory practices.[42] However, the day has passed when even private discrimination in the lease or sale of property will be allowed by the United States Supreme Court.[43]

In all fairness to Elmwood, it should be noted that covenants restricting burial in cemeteries to Caucasians are not a Southern or Alabama phenomenon. As recently as 1953, it was estimated that there were racial restrictive covenants in ninety per cent of all public cemetery deeds and regulations in the United States, because "people, like animals, prefer to be with their own kind." [44]

Also, the court is aware of and has examined the several decisions that have upheld racial restrictive covenants or

40. 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

41. 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948).

42. Note, Constitutional Law—State Action—Racial Restrictive Covenant Cannot be Recognized as a Defense to a Suit for Specific Performance of a Cemetery Burial Contract, supra note 33, at 735–36.

43. The Court made this point clear in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 2195, 20 L.Ed.2d 1189 (1968), when it stated:
Thus, when Congress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private.
Id. at 423–424, 88 S.Ct. at 2186. It might be noted that litigation expense to all parties involved in the instant case will most likely be minimized by a frank recognition that if this case is appealed to higher federal courts, the outcome in favor of the plaintiffs is a virtual certainty, given the emotional posture of the case, and the federal appellate courts'

increasing impatience with any kind of distinction based on race. See, e. g., Alexander v. Holmes County Bd. of Educ., 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19 (Oct. 29, 1969) ("all deliberate speed" doctrine in school desegregation abrogated).

44. Rice v. Sioux City Memorial Park, 245 Iowa 147, 60 N.W.2d 110 (1953), aff'd mem. 438 U.S. 880, 75 S.Ct. 122, 99 L. Ed. 693 (1954), vacated, petition for cert. dismissed, 349 U.S. 70, 75 S.Ct. 614, 99 L.Ed. 897 (1955). Although the actual reference was made to "private" cemeteries, the context of the statement clearly shows that under the test enunciated in note 1, supra, the cemeteries referred to were public in that they were and are used by the general community. In response to the comment that "people, like animals, prefer to be with their own kind," one cannot resist quoting Judge Dooling of California:
I cannot believe that a man's mortal remains will disintegrate any less peaceably because of the close proximity of the body of a member of another race, and in that inevitable disintegration I am sure the pigmentation of the skin cannot long endure * * *
Long v. Mountain View Cemetery Ass'n, 130 Cal.App.2d 328, 278 P.2d 945, 946 (1955) (concurring opinion).

regulations with regard to cemetery lots.[45] However, it suffices to observe that this authority is obsolete, all of it antedating *Jones.*

█ Applying the principles enunciated herein to the facts of the instant case, the court holds that under § 1982, defendant Elmwood is legally obligated to sell burial plots in its public cemetery to all United States citizens, on equal terms, without regard to race or color, and has unlawfully abridged plaintiffs' rights under such statute by refusing to sell them cemetery lots solely because they are Negroes. Further, the court declares that the provisions in all existing Elmwood Cemetery lot deeds limiting interment in such cemetery to members of the Caucasian race, and similar provisions in the Elmwood rules and regulations, are void and of no legal effect.

Since the court has concluded that § 1982 is dispositive of the rights and duties of the parties to this case, it will not consider the contention of the plaintiffs that the action of defendant Elmwood in refusing to sell cemetery lots to plaintiffs was also violative of 42 U.S.C. § 1981 (1964). Furthermore, because compensatory damages cannot yet be accurately ascertained, the court will pretermit consideration at this time of plaintiffs' claim for damages, both compensatory and punitive, and for attorneys' fees. Consequently, jurisdiction of this cause will be retained, pending voluntary compliance with the principles enunciated and rights declared in this opinion, and reapplication to this court by the plaintiffs for an award of damages.

Judgment in conformity with the foregoing opinion will accordingly be entered.*

---

45. See, e.g., Forest Lawn Memorial Park Ass'n v. De Jarnette, 79 Cal.App. 601. 250 P. 581 (1926); People ex rel. Gaskill v. Forest Home Cemetery Co., 258 Ill. 36, 101 N.E. 219, L.R.A.1917B, 946 (1913); Rice v. Sioux City Memorial Park Cemetery, 245 Iowa 147, 60 N.W. 110 (1953); Annot., 110 A.L.R. 388 (1937) (right to exclude from privilege of burial in cemetery).

* Credit is due Robert L. Potts, Law Clerk to the Court, for the preparation of this opinion.